THE STATE *ex rel.* JOHN RYLANDS *vs.* JOHN P. PINKERMAN.

New Haven & Fairfield Cos., April T., 1893.  CARPENTER, TORRANCE, FENN, BALDWIN and ROBINSON, Js.

An appellee cannot maintain a plea in abatement of an appeal from a judgment of ouster in a quo warranto proceeding on the ground that he is in undisturbed possession of the office and that the appellant no longer claims it, unless the inquiry whether the judgment appealed from was right or wrong has become immaterial.

The relator in a quo warranto proceeding had been declared to be removed from the office of chief of police of a city by the board of police commissioners, who thereupon assigned the duties of the office to the defendant, who as captain of police was next in rank in the police force. The court having rendered a judgment of ouster against the defendant, he appealed to this court. The relator pleaded in abatement of the appeal that he had been put into possession of the office and that since the appeal the defendant had been removed by the police commissioners from the office of captain of police. The defendant replied that he was removed upon the relator's charges and that the causes assigned for his removal were his refusal to obey the orders of the relator and his continuing the litigation in spite of the adverse decision of the court. To this replication the relator demurred. Held that there was not sufficient ground for an abatement of the appeal.

Though a proceeding of this sort is in the name of the state, yet the relator is the substantial complainant and conducts the cause.

A city charter provided for the appointment of a board of police commissioners of four electors of the city, to be divided between the two leading political parties, two of whom should be appointed each year and all of whom should hold office for two years and until their successors should be appointed and qualified, any vacancy occurring to be filled in the same manner. Held that when a vacancy was filled the appointee held the office only for the residue of the term of his predecessor and not for two years.

*W,* a police commissioner appointed to fill a vacancy, claimed the right to hold the office for two years, and, after the term of his predecessor had expired and a member had been appointed in his place and sworn, he acted at a meeting of the commissioners. Held—

1. That the action of the board in removing the relator from the office of chief of police, and which required the vote of *W* to make the necessary majority, was a nullity, unless *W* was a commissioner *de facto.*

2. The court below found that at no time after the expiration of his legal term did *W* have the reputation of being a police commissioner, nor were his acts and authority as a pretended commissioner generally recognized or acquiesced in, nor was he an incumbent of the office under such apparent circumstances of reputation or color as would have led

men to suppose that he was a legal commissioner, nor did he exercise its duties under such circumstances of continuance, reputation or acquiescence as reasonably to authorize the presumption that he was a commissioner or as were calculated to induce people without inquiry to invoke or submit to his action. Held that this finding was decisive as to his not being a *de facto* commissioner.

3. That even if *W* had been a *de facto* commissioner the want of notice of the meeting to the rightful commisioners would have been a fatal objection to the validity of the action of the board.

By the city charter the mayor was to appoint the police commissioners by and with the consent of the board of aldermen. On the expiration of *W's* legal term as commissioner, the mayor sent in the name of *R* as his successor, *W* claiming that his term had not expired and that there was no vacancy. By the rules of order of the alderman, their modes of proceeding, where not otherwise provided for, were to be governed by parliamentary practice as set forth in Cushing's Practice of Legislative Assemblies. Held that *W*, as one of the aldermen, had a right under that practice to vote upon the question of the confirmation of *R* as his successor.

If *W* had not had the right to vote upon this question, yet after his vote had been received and the result declared by the presiding officer, there was no remedy but by formal action of the house in passing a motion for its disallowance.

The mayor called a meeting of the board of aldermen to be held on May 20th, at half past seven in the evening. By the charter he presided and in case of a tie had a casting vote at their sessions. There were twelve aldermen and seven were necessary to a quorum. The mayor and six aldermen attended, and a warrant was issued by the mayor, under authority of the charter, to bring in the absent members, who had left the city, but who came in on the 22d. The meeting had been kept open from the 20th, and on the attendance of the six members who had been absent, was called to order by the mayor, who presented in writing the nominations of *R* and *S* as police commissioners. Objection was made to its presentation, which resulted in a tie vote, upon which the mayor gave a casting vote and declared the nominations in order. Votes confirming the nominations were then had, resulting in each case in a tie vote, the mayor giving a casting vote in their favor. Held—

1. That the mayor having by the charter the right to give a casting vote in case of a tie, his right to do so applied to all proper business acted upon.

2. That an error in the warrant, issued to bring in the absenting members, by which the meeting of the aldermen was described as called for 8 o'clock in the evening, instead of 7.30 o'clock, was of no consequence, as no one could have been misled by it.

3. That it was not material whether the nomination of the police commissioners was taken from the table as old matter, in pursuance of the rules of the board, or taken up as new matter. The aldermen had power to suspend or disregard their rules of order by a majority vote, and in

voting to consider the nominations, they in effect suspended all rules inconsistent with such action.

4. That the specification in the call for the meeting of certain matters to be acted upon, did not preclude action on the nominations, though not mentioned in the call, such action being within the range of its general powers.

5. That it was not necessary, for the purpose of keeping open the meeting of the aldermen from May 20th to May 22d, that the members who attended on the 20th should remain in actual session.

The common council, which by the charter had power to pass and repeal ordinances relating to the police department, passed an ordinance providing " that the office of chief of police is hereby abolished," and that " the captain of police shall be vested with all the powers and shall perform all the duties formerly exercised by or imposed upon the chief of police." Held—

1. That if this ordinance was to be construed as a mere attempt to remove the incumbent of an office and appoint another to exercise its functions, it would be void, the removal of the chief of police being a matter within the sole jurisdiction of the police commissioners.

2. But that if it could be supported as a legitimate exercise by the council of its authority to make and repeal ordinances with regard to the police department, it was the duty of the court to give it such a construction as would make it operative.

3. That the ordinance would bear such a construction.

An office created by ordinance can be abolished by ordinance.

Our statutes in many cases give to the chiefs of police of cities certain powers and impose upon them certain duties, but no duty is thereby imposed on any city to maintain an officer known by that designation. The state has dealt with his functions, not with his name.

Under a city charter providing for a common council of two chambers, and giving the mayor power to approve or disapprove such measures as the common council may adopt, he has no power to approve or disapprove the votes of either chamber on matters committed by the charter to its sole and separate action.

A meeting of a board of city government called for half past seven o'clock, was not called to order until a quarter past eight o'clock. Held that this delay was not necessarily unreasonable, and did not affect the legality of the meeting.

[Argued April 19th,—decided June 5th, 1893.]

INFORMATION in the nature of a quo warranto, filed in the Superior Court in Fairfield County in October, 1891, against the captain of police of the city of Bridgeport, for usurping the office of chief of police of the city, claimed to belong to the relator. The defendant pleaded that the relator had been duly removed from the office of chief of

police on June 11th, 1891, by the board of police commissioners of the city for cause, and that they thereupon had committed the exercise of the duties of chief of police to the defendant, being the officer next in rank, pursuant to the city ordinances; and also that, on September 23d, 1891, the office of chief of police was abolished by a city ordinance, under the provisions of which the defendant was lawfully exercising the duties formerly pertaining to that office. A demurrer to so much of the plea as set up the passage of the ordinance abolishing the office of chief of police was sustained by the Superior Court, (*Andrews, C. J.*) To the other allegations of the plea a replication was filed, setting up in detail the mode in which the board of police commissioners, by which the vote of removal was passed, was constituted, and certain alleged irregularities in its proceedings, through want of notice of its meetings to all its members, want of a quorum, etc., which are sufficiently stated in the opinion. A rejoinder was pleaded alleging that the board of police commissioners was constituted, not of the persons and in the manner alleged in the replication, but in part of different persons, otherwise appointed, and that this board, as thus constituted, had proceeded regularly in the removal of the relator. Other facts bearing on the same points were set up by surrejoinder, and the pleadings closed by a rebutter.

The trial of the issues of fact was had to the court (*Prentice, J.,*) and judgment of ouster rendered March 23d, 1892. A notice of appeal by the defendant was filed on the same day, and a special finding of facts having been subsequently made, the appeal was perfected on June 20th, being taken to the October term of this court, 1892. At the April term of this court, 1893, the State, on the relation of John Rylands, filed a plea in abatement of the appeal, alleging that on June 25th, 1892, the board of police commissioners had removed the defendant for cause from the office of captain of police, and appointed his successor, who had duly qualified and entered upon the duties of the office on that day, since which the defendant had not exercised any of said duties nor interfered with the relator in the exercise of his

duties as chief of police, and that the relator was in full and undisturbed possession of said office. A motion to dismiss was also filed setting up the same causes. The defendant filed a replication showing that the causes for which he was removed were his exercise of the powers of chief of police on and after June 11th, 1891, and disobeying the orders of the relator, and that the charges against him were preferred by the relator after the defendant had taken his appeal to this court, and that the order of removal specified as one cause of his removal, that since April 6th, 1892, he had been keeping alive the litigation in the courts against the relator, and threatened to continue it, in spite of decisions of the Superior Court adverse to his claim; yet that the only litigation referred to was the present appeal, and an action of mandamus, in which he was the relator, brought after his dismissal in June, 1892, to reinstate him in his office, the hearing of which had been postponed until a decision on this appeal. To these allegations the State demurred, and by request of the parties, both the plea in abatement and the main appeal were argued together.

*H. Stoddard* and *J. B. Klein,* for the appellant.

*D. Davenport* and *S. Judson, Jr.,* for the appellee.

BALDWIN, J. The plea in abatement which has been interposed by the State, goes upon the ground that the farther prosecution of this appeal would simply invite the court to decide questions that are no longer of any practical importance, since the relator is now in full and undisturbed possession of the office which was the occasion of the action. It appears, however, that he has recovered such possession by reason of the removal of the defendant from his office of captain of police, and that this removal was made pending the appeal, and upon charges of insubordination preferred by the relator. The insubordination consisted of acts similar to those upon which the original *quo warranto* proceedings were based, and the decree of removal is also placed in

State ex rel. Rylands *v.* Pinkerman.

part upon the ground that the prosecution of this appeal, and of an action of mandamus brought or promoted by the defendant to reinstate him in office, interferes with the harmonious working of the police force.

An appellee can maintain a plea in abatement of this kind only on the ground that the inquiry whether the judgment appealed from was right or wrong has become immaterial. But if the judgment of ouster was wrong, to dismiss the appeal, at the instance of the appellee, because the appellant has been removed from office for prosecuting the appeal, and the appellee re-instated, would be to allow the relator to take advantage, if not of his own wrong, at least of the error of the court, to defeat the remedy provided by law for the redress of such an error. The appellant did not voluntarily withdraw from the contest over the office claimed by the relator. He was forced out of it by a sentence of removal, procured by the relator, and based upon an assumption of the validity of the judgment appealed from, and the consequent misconduct of the appellant in endeavoring to obtain its reversal. The appellant's reply to the plea in abatement summarizes the appellee's contention not unfairly, by the statement that "the defendant, Pinkerman, was dismissed on Rylands's charges, because he appealed his case against Rylands to this court; and now Rylands asks that this appeal to this court be dismissed because Pinkerman has been dismissed from office because he took the appeal."

It is true that the State is in form the appellee, and that the pleadings do not show that the State took any part in the proceedings which have resulted in the dismissal of the appellant from office. But in informations of this nature the relator is the substantial complainant and conducts the cause. The only brief filed in this case for the appellee is entitled "brief for relator," and states that execution was issued "in favor of the relator," on the judgment of ouster rendered by the Superior Court.

The State has no interest, except that the rightful incumbent of the office in controversy, if such an office exists, should exercise its functions, and we do not think the acts

of either of the claimants should be allowed to prejudice the right of the other to a final determination of the question of title. The matter in difference is not a mere bill of costs in a contest over a position in a private corporation, as in *State* v. *Tudor*, 5 Day, 329. The powers of one of our largest municipal corporations as to a subject vitally affecting its peace and order are the subject of controversy, and in our opinion the appellant has a right to require us to review a judgment by an execution issued under which he was ousted from the exercise of the functions of chief of police before he was dismissed from the office of captain of police. These positions are of a class in which the State and the whole people of the State have a deep and immediate concern. Whoever holds one of them, holds it as a trust from the State, resting not on contract with the city, but on an appointment made by the city under a power conferred on it by the State. *Farrell* v. *City of Bridgeport*, 45 Conn., 191, 195.

We think the reply to the plea in abatement and motion to dismiss is sufficient, and that they must be overruled.

The appeal presents two main questions, that as to the validity of the removal of the relator from the office of chief of police in June, 1891, and that as to the effect of the ordinance of September, 1891, relating to the abolition of that office, which went into effect a month before the information was filed.

The present charter of the city of Bridgeport was passed in 1887. Vol. 10, Private Laws, p. 510. It contains the following provisions as to the constitution and administration of the police department.

"Sec. 50. There shall continue to be a board of police commissioners, of fire commissioners, and park commissioners, each of which shall consist of four electors of said city, and each commissioner shall hold his office for the term of two years, and until his successor is appointed and qualified, and on the expiration of the terms of office of each of the present commissioners their successors shall be appointed for the term of two years next succeeding, and until their suc-

cessors shall be appointed and qualified. The mayor of said city shall, by and with the advice and consent of the board of aldermen of said city, appoint the members of the several boards of police commissioners, of fire commissioners and park commissioners, and the appointment of the members of the said several boards of commissioners as aforesaid shall be made in such manner as to divide the membership of each of said boards equally between the two leading political parties for the time being, and whenever any vacancy shall occur in any of said several boards of commissioners it shall be filled in the manner provided aforesaid for the appointment of members. The mayor of said city, by and with the advice and consent of two thirds of the members of the board of aldermen, may remove any member of either of said boards of commissioners for cause. The members of either of said boards of commissioners now in office shall retain their positions during the term for which they were elected, subject to removal in the manner hereinbefore set forth. The mayor of the city shall, ex officio, be a member of said several boards of commissioners, but shall have no vote in any of their proceedings except in case of a tie vote. He shall preside at all meetings of said boards at which he is present, and at all meetings of said boards three members, exclusive of the mayor, shall constitute a quorum, and the concurrence of three of them shall be necessary for the transaction of business. The commissioners of said several boards, before entering upon the discharge of their duties, shall be sworn to a faithful performance thereof. Each of said boards shall appoint a clerk, whose duty it shall be to keep, in books provided for that purpose, true records of the doings of said boards respectively."

" Sec. 58. The police commissioners of said city of Bridgeport shall have the sole power of appointment and removal of officers and members of the police department of said city; and it shall be the duty of the said board of police commissioners to appoint suitable persons to fill the offices of said police department, and other suitable persons as members of said police department, and to suspend, remove

or expel any officer or member from office or membership in said department whenever, in the judgment of said commissioners, such suspension, removal or expulsion shall be for the best interests of the city; and whenever any person shall be appointed an officer or member of said police department, or whenever any officer or member of said police department shall be suspended, removed, or expelled from his office or membership in said department, it shall be the duty of the said board of police commissioners to give a written notice, within a reasonable time, to the city clerk of said city, of such appointment, suspension, removal or expulsion. The present police force of said city shall hold their respective offices, unless previously suspended, removed, or expelled, until others are appointed in their stead; and every officer or member of said police department shall hold his office and membership in said department until removed or expelled by said board of police commissioners for cause, of which said board of police commissioners shall be the sole judges. Nothing contained in this section shall be so construed as to prevent the common council of said city of Bridgeport from increasing or reducing the members of the police force of said city, or creating new offices in said police department; and in case the common council of said city shall vote to reduce the police force of said city, the board of police commissioners shall remove a sufficient number of the officers and members of said police force to conform to the vote of said common council.

"Sec. 59. The common council of said city shall have power to pass an ordinance or ordinances relative to the proper regulation of the police department, and relative to whatever further control of said department the said common council may deem proper to place in the hands of said board of police commissioners."

By section 24 the common council was also authorized "to make, alter and repeal orders and ordinances, not inconsistent with the provisions of the charter, which shall be valid and operative within the limits of said city," relative to a number of specified matters, and among others " to the city

police, * * * to the filling of vacancies which may occur in the common council, or in any office appertaining to said city for the unexpired term, not otherwise provided for in this act; " and to the duties of all officers of the city " not expressly defined by the provisions of this act." General power was also given to make and repeal ordinances " relative to all other subjects that shall be deemed necessary and proper for the protection and preservation of the health, property and lives of the citizens," and " to constitute and appoint all necessary and proper committees and officers, under such names and appellations as they may deem appropriate," and to " invest them with the power and authority necessary and proper to carry into full effect all the orders and ordinances of said common council."

Section 62 provides that bail bonds and recognizances in the City Court may be taken " by the chief of police or acting chief of police of said city," and that each member of the police department shall have " power, by the permission of the chief of said department, to pursue and arrest with process, in any part of this state, persons charged with any criminal act committed in said city."

Section 63 provides that " the chief of said police department shall have power, subject to the control of the board of police commissioners of said city, to suppress all tumults," enter houses of ill-fame, and raise the posse of the city to aid him in the exercise of his authority.

The common council adopted, before the present controversy arose, an ordinance relative to the police department. Section 1 of this ordinance declares that " the board of police commissioners shall have the general management and control of the police department," and may make rules for its government, consistent with the laws of the state and ordinances of the city. Section 6 provides that " the regular police force of this city shall consist of a chief of police, captain, lieutenant, first and second sergeant, and not less than ten nor more than twenty-eight patrolmen." Section 9 provides that " the chief of police, subject to the control of the mayor and police commissioners, shall have the control

and management of the subordinate officers and members of the police department, and they shall obey his orders. He shall also have charge of the station houses and the custody of all persons committed to or confined therein. He shall also keep a record of the officers and members of the police force and of their doings. He shall also keep an accurate monthly pay roll of the police force, in which he shall designate the date and period of service of each member of the force, and the several amounts due them respectively for that month, and when payment is made, shall take the receipt, on such pay roll, of each member for the amount paid him ; and such pay roll thus kept and receipted shall thereupon be lodged by him with the city auditor to be kept on file. In the absence of the chief of police, or when from any cause he shall be unable to act, the captain shall take his place and perform his duties, and in the absence or inability to act of both the chief and captain, the lieutenant shall discharge the duties of chief of police."

The relator was duly appointed and qualified as chief of police in January, 1890. In December, 1890, the four police commissioners severally resigned their positions, and shortly afterwards the vacancies were duly filled by the appointment of Messrs. Beardsley, Bogart, Grant and Rishor. In February, 1891, the mayor appointed David Walsh to fill a vacancy occasioned by the death of Mr. Beardsley, to hold office for the unexpired term.

The form in which this appointment was made raises an important question in the case, the defendant contending that, though purporting to be for the unexpired term, it was, in law, by force of the charter provisions above quoted, an appointment for a full term of two years. Underlying this question there is also obviously another, namely—what was the length of the term for which Mr. Beardsley was originally appointed? If it was for the unexpired portion of the term of his predecessor, Mr. Grant, it terminated in April, 1891; but if it was for a full term of two years, it would not come to an end until December, 1892, and Mr. Walsh, even if his appointment were restricted to the limit placed

upon it by the form of his nomination, would remain in office until that date, as would also the two others appointed in December, 1890, Messrs. Bogart and Grant, while Mr. Rishor, whose nomination was not sent in until January, 1891, would hold office until January, 1893.

The terms. for which Messrs. Grant and Spencer, (who had been replaced by Messrs. Beardsley and Bogart,) were originally appointed expired in April, 1891, and the mayor then nominated M. L. Reynolds to succeed Mr. Walsh and E. H. Sperry to succeed Mr. Bogart. When the nominations were presented, upon motion of Mr. Walsh, who was a member of the board of aldermen, the board voted to lay them upon the table until the last meeting in March, 1892. At the next meeting of the board the mayor sent in a message disapproving this action, and a motion " to sustain the veto" resulted in a tie vote. The mayor then voted for the motion and declared it carried. By the city charter (Sec. 7,) he is empowered to " preside at the meetings of the board of aldermen, and shall have a casting vote only in case of a tie." It is sufficient to remark, with reference to the proceeding last mentioned, that as the charter only provides for the approval or disapproval by the mayor of measures which have passed both of the boards constituting with him the common council, his message of disapproval was without any legal effect.

The mayor, who had power to convene the common council at any time, subsequently called a meeting of the board of councilmen for May 18th, and a meeting of the board of aldermen at half-past seven o'clock on May 20th, each call specifying the object of the meeting as follows :—" for the purpose of electing a liquor and dog agent, also a public pound keeper, and transacting any other business proper to be done at said meeting." The city ordinances provided that the common council at special meetings might act upon any matter mentioned in the call, " and do any other business proper to be done at any regular meeting." By the charter (Sec. 7,) the board of aldermen and the board of

councilmen are "two separate bodies," holding (Sec. 26,) separate meetings.

On May 20th, at half-past seven, the mayor and all the aldermen were at the city hall, six of the latter, including Mr. Walsh, being in the chamber where the meeting was to be held, and the rest of the board, also numbering six, being in an adjoining room in conference with the mayor. Seven aldermen were necessary under the charter to constitute a quorum, and the six who were in the aldermanic chamber, and who had come there for the purpose of participating in the meeting, after waiting until ten minutes past eight without being joined by the others, agreed to leave the hall and the city, in order to prevent any action at the meeting with reference to the appointment of police commissioners. They then drove together to an adjoining town, and were thereafter in hiding in various parts of the state until noon on May 22d.

Five minutes after they had left the city hall the mayor and the six aldermen who had been with him entered the aldermanic chamber, and the meeting was called to order. The charter (Sec. 7,) gave those present at any meeting of the board, if less than a quorum, power to require the mayor to issue a warrant to arrest and bring in the absent members. Such a warrant was thereupon issued, and from that time until noon of May 22d, the mayor and the six remaining aldermen or a majority of them were continuously in or about the aldermanic chamber for the purpose of keeping the meeting alive. At noon on May 22d the six absentees voluntarily returned to the city, and, the warrant being read to them, entered the chamber with the officer and took their seats. The mayor and the six other aldermen were present, and the meeting was called to order. After some miscellaneous business, in which all participated, the mayor presented in writing the nominations of Messrs. Reynolds and Sperry as police commissioners. Objection was made to their presentation, which resulted in a tie, whereupon the mayor gave a casting vote and declared them in order. Votes confirming the appointments were then had and declared in the

same manner by the casting vote of the mayor.   A dog and liquor agent was then elected, and a good deal of other business transacted, in which all present took part.

Messrs. Reynolds and Sperry were soon afterwards sworn in and qualified as police commissioners, and Mr. Sperry's predecessor surrendered to him his badge of office and made no further claim to the position.   Mr. Walsh, however, as whose successor Mr. Reynolds had been nominated, refused to recognize him as such, and continued to claim to be a police commissioner, performing some of the acts properly appertaining to that position while Mr. Reynolds performed others.   Mr. Walsh was still recognized as a commissioner by Messrs. Grant and Rishor and by the clerk of the board. Mr. Reynolds was recognized as a commissioner by the mayor and the relator as chief of police.   Each also had recognition and support from friends and partisans in and out of the common council.

The mayor called a meeting of the board of police commissioners for organization, on May 30th, 1891, at the city hall, on notice to Messrs. Grant, Rishor, Reynolds and Sperry, but it was attended only by himself and Messrs. Reynolds and Sperry.   No business could be transacted, under section 50 of the charter, without the concurrence of three commissioners.   Meetings of the rival board were held at the house of one of its members, on notice to the mayor and Messrs. Grant, Rishor, Walsh, and Bogart, at which Messrs. Grant, Rishor and Walsh attended, with the clerk, and business was transacted.   At one of these meetings, held on June 11th, 1891, a vote was passed purporting to remove the relator for cause from the office of chief of police.   He had been summoned to appear and answer the charges against him, and had paid no attention to the summons.

It is evident that he was not removed from office unless Mr. Walsh can be counted as one of the three commissioners whose concurrence was necessary.   If his appointment, in February, 1891, to fill the unexpired term of Mr. Beardsley, amounted in law to an appointment for a full term of two years, or if Mr. Beardsley's term was one of that length, he

was rightfully a member of the board in June. But we are of opinion that complete effect can be given to the provisions of the charter only by construing it as confining appointments to fill vacancies to appointments for the residue of the unexpired term.

The evident intent of section 50 is to secure to the city at all times, so far as possible, the services of commissioners half of whom have had the benefit of at least a year's experience in office, and to divide the membership of each half equally between the leading political parties. *Parmater* v. *The State*, 102 Ind., 90, 93. Such a board had existed in Bridgeport since 1868. The charter of that year provided for the election of two commissioners to serve for one year, and two for two years, and for the annual election thereafter of two to serve for two years, and secured a non-partisan character to the board by allowing no one to vote for more than two out of the four, and requiring the election of deputy commissioners to replace each elected commissioner in case of a vacancy. From that time until the resignation of the entire board in December, 1890, its membership had been annually renewed by the appointment of two commissioners for a term of two years, each belonging to a different political party from the other.

Were the contention of the defendant well founded, the successors of the four commissioners who resigned in December, 1890, should have been, and in law were, appointed each for a two years term, thus totally and forever frustrating the carefully devised scheme of alternating succession which had been followed for twenty years.

It was therefore incumbent upon the mayor in April, 1891, to send in nominations for two commissioners to succeed Messrs. Walsh and Bogart. He did so, and we must next inquire whether they were properly confirmed by the board of aldermen.

In our opinion the meeting of that board on May 20th was legally convened, was called to order within a reasonable time from the hour appointed, and was legally continued until May 22d. *South School District* v. *Blakeslee*, 13 Conn.,

227. The provisions of the charter for bringing in absent members contemplated such a contingency as in fact occurred on that occasion, and it was unnecessary for the members in attendance to remain actually in their seats in the aldermanic chamber during the hours or days which elapsed before the absentees returned. The warrant of arrest, issued by the mayor, described the hour at which the meeting was originally called as eight o'clock, which was, in fact, half past seven, but the error could mislead no one, and did not impair the validity of the instrument.

It is immaterial whether the nominations for police commissioners were taken from the table at this meeting in a manner pursuant to the rules of the board, or whether they were entertained as new business. The board had power to suspend or disregard its rules of order by the vote of a majority; and to vote on the consideration of the nominations in effect suspended all rules inconsistent with such a vote. Cushing on the Law and Practice of Legislative Assemblies, §§ 794, 1478; Bennett v. City of New Bedford, 110 Mass., 433, 438; State ex rel. Cole v. Chapman, 44 Conn., 595; Hough v. City of Bridgeport, 57 id., 290, 295.

Section 24 of the charter declares that " the mayor, board of aldermen, and board of councilmen of said city, shall constitute and be a body known and denominated the common council of the city of Bridgeport." Section 7, as previously quoted, provides that the mayor shall preside at the meetings of the board of aldermen, " and shall have a casting vote only in case of a tie." There is no limitation of this casting vote to any particular kind or class of business. A tie is more likely to occur upon questions involving political considerations, and arises most often as to the creation of offices or appointments to office. This the legislature may be presumed to have had in mind when this section was adopted, and we see no reason for adopting a narrow construction of a provision plainly adapted to the prevention of " dead locks," which are never more injurious to good government than when the result of a contest which keeps an office vacant that the public interests require to be filled, or prolongs an

official term beyond the period contemplated by law. *Carroll* v. *Wall*, 35 Kansas, 36. If the board of aldermen should be equally divided upon the passage of an ordinance recommended by the mayor in his annual message, it would not be doubted that he could break the tie. We perceive no greater reason for refusing him a casting vote, when he has proposed, not a measure of legislation, but a candidate for office.

The tie was created by the vote of Alderman Walsh, which was cast against the confirmation of Mr. Reynolds as his successor in the office of police commissioner.

By the rules of order of the board of aldermen all differences of opinion in regard to modes of proceeding, not otherwise provided for, were to be " governed by parliamentary practice, as set forth in Cushing's Law and Practice of Legislative Assemblies." In that work it is stated (§§ 1784, 1789, 1844) to be the common parliamentary rule that no member of a legislative assembly shall vote on any question involving his own character or conduct, his right as a member, or his pecuniary interest ; but that an interest of the latter description only exists when it is immediate, particular and distinct from the public interest; and that (§ 1837) the reception of such a vote, after the declaration of the result by the presiding officer, can only be remedied by formal action of the house in passing a motion for its disallowance.

The right of a member of a legislative body to vote on a question involving his right to the seat he holds in it is a very different one from that which arises on a question as to his tenure of some other office. This distinction was strongly emphasized in the discussions arising upon a motion made in the senate of the United States, in 1866, to disallow Senator Stockton's vote upon a resolution declaring him entitled to retain his seat. Senator Foster, then the president of the senate, a distinguished parliamentarian, and afterwards a member of this court, took the ground that the chair had no power to exclude the vote, but that the senate could. During the debate Senator Sherman of Ohio, while advocating the motion, in view of Mr. Stockton's peculiar relation to the

subject of the resolution for which he had voted, stated that he had himself on one occasion, as a representative, determined that should his vote, as such, be necessary to secure his own election to another position, for which he had been placed in nomination, his duty to his constituents would require him to give it, and similar veiws were expressed by Senators Trumbull of Illinois and Reverdy Johnson of Maryland.    Congressional Globe, 1st Session, 39th Congress, 1602, 1636, 1643, 1647 ; *Phillips* v. *Eyre*, L. R., 4 Q. B., 225, 235.

It is our opinion that Alderman Walsh had the right to vote against the confirmation of Mr. Reynolds as his successor in the office of police commissioner, and that, even had it been otherwise, his vote, when once given and counted by the mayor in his declaration of the result, could only be rejected by the action of the board of aldermen.

In regard to the notice given of the objects of the meeting, it is enough to say that, with respect to such a body, the specification of certain objects does not exclude action upon any others which are within the range of its general powers.    *Whitney* v. *City of New Haven*, 58 Conn., 450, 460.

It follows, that Messrs. Walsh and Bogart ceased to be rightful police commissioners upon the qualification of their successors in May, 1891.

The removal of the relator from office, in June, 1891, by the so-called board of police commissioners, constituted of Messrs. Grant, Rishor and Walsh, was therefore a nullity, unless Mr. Walsh was a *de facto* commissioner.    Against such a claim the finding of the Superior Court is decisive. It is that at no time between May 21st and September 23d, 1891, did he have the reputation of being such a commissioner, nor were his acts and authority as a pretended commissioner generally recognized or acquiesced in, nor was he an incumbent of that office under such apparent circumstances of reputation or color as would have led men to suppose that he was a legal commissioner, nor did he exercise the duties of that office under such circumstances of continuance, reputation, acquiescence, or otherwise, as reasonably to authorize the presumption that he was such a commis-

sioner, or as were calculated to induce people without inquiry to submit to or invoke his action.

The want of notice to either of the rightful commissioners appointed in May, of the meetings of the pretended board of commissioners, would also be a fatal objection to the validity of the sentence of removal, even had Mr. Walsh been a *de facto* commissioner.

It follows that the relator continued to be chief- of police until September, 1891. Upon September 22d, 1891, an ordinance was adopted by the common council which reads as follows:

" Be it ordained by the common council of the city of Bridgeport:—

" Section 1. That the office of chief of police be and the same is hereby abolished.

" Section 2. That section 6 of chapter 17, being ' an ordinance relative to the police department,' be and the same is hereby amended by striking out the words ' chief of police ' in the second line thereof.

" Section 3. That section 9 of said chapter 17, being ' an ordinance relative to the police department,' be and the same is hereby amended by adding thereto the following: 'If at any time the office of said chief of police be abolished or ceases to exist, then said captain of police shall be vested with all the powers and responsibilities, and shall perform all the duties, formerly exercised by or imposed upon said chief of police by the statutes of the state, the charter and ordinances of the city of Bridgeport, and the rules of the police department of said city.'

" Section 4. All ordinances and parts thereof now in force and inconsistent with any part of this ordinance are hereby repealed."

It is obvious that this ordinance was inartificially drawn, but its general purpose is unmistakable. It was designed to abolish the office of chief of police, to amend certain of the ordinances in such a way as to secure the devolution of the functions of the office upon the captain of police, and

to repeal all provisions of the ordinances which were inconsistent with the accomplishment of these objects.

If this ordinance is to be construed as a mere attempt to remove the incumbent of an office and appoint another to exercise its functions, it would be void. *Farrell* v. *City of Bridgeport*, 45 Conn., 191, 193. The removal of a chief of police is, by section 58 of the city charter, a matter within the sole jurisdiction of the board of police commissioners.

But we are not to presume an improper motive. If the ordinance can be supported as a legitimate exercise by the common council of its authority to make and repeal ordinances with respect to the police and to the proper regulation of the police department, it is our duty to give it such a construction as will make it operative and consistent with the charter. *West School District* v. *Merrills*, 12 Conn., 437, 439; *Bartlett* v. *Kinsley*, 15 id., 327, 331; Beach on Public Corporations, §§ 516, 517.

In the case of *State ex rel. Birdsey* v. *Baldwin*, 45 Conn., 134, we held that an act abolishing by one section the board of county commissioners of New Haven County, and by the next section creating a board of commissioners for New Haven County, with the same functions as those of the board which was abolished, was self-destructive, and that there was never a moment when the office of county commissioner for New Haven County was not in continued existence. But in the case before us, after the abolition of an office comes. not the creation of a similar one, but the devolution of its functions, or of some of them, on the incumbent of another office.

An ordinance, above quoted, already existed which provided (Sec. 9,) that when from any cause the chief of police should be unable to act, the captain should take his place and perform his duties. The framers of the new ordinance were apparently in doubt whether that section would cover the case of the abolition of the office of chief of police, and therefore sought to amend it by making an express provision for that contingency. It was a contingency no longer, for the first and second sections had completed the work of

abolition, and their intent would have been better expressed had the amendment of section 9 thrown the powers and duties of the chief of police upon the captain of police, not if the office of the latter should be abolished, but as soon as the ordinance took effect by which it was abolished.

That this was the purpose in view seems to us apparent upon a comparison of its different sections, and we think the language used justifies and requires such a construction as will give this purpose effect. *Whitlock* v. *West*, 26 Conn., 406, 414.

The office of chief of police was one which had been created in 1874 by the ordinance, section 9 of which was thus amended. By section 6 of that ordinance it was provided that "the regular police force of said city shall consist of a chief of police, captain, lieutenant, first and second sergeant, and not less than ten nor more than twenty patrolmen." Out of this section the ordinance of 1891 struck the words "chief of police." This amendment was a return to the scheme of organization for the police force contained in an earlier ordinance adopted in 1872, in which the chief officer of the department was styled captain of police. Prior to 1872 the officers of the department, under an ordinance adopted in 1869, had been a chief of police, a captain, and two sergeants. An office created by ordinance may be abolished by ordinance. *Butler* v. *Pennsylvania*, 10 How., 402, 416; *State* v. *Douglas*, 26 Wis. 428.

Neither the city charter nor the General Statutes of the state appears to us to contain any such mention of an office of chief of police as to amount to a declaration that an office by that name must necessarily exist in Bridgeport.

General Statutes, § 1646, after providing that incorrigible offenders, if released from the state's prison on parole, may be recommitted by order of the directors of the prison, makes it "the duty of all chiefs of police and marshals of cities and towns, and the sheriffs of counties, and of all police officers and constables," to execute any such order.

Sec. 2998 provides that "the chief of police of any city" may license junk shops in such city.

State ex rel. Rylands v. Pinkerman.

Sec. 3000 contains a similar provision as to licensing pawn brokers, and Sec. 3001 gives power to examine the books and premises of pawn brokers in any city to "the chief of police of said city or any person by him designated."

Sec. 3106 gives authority to enter and inspect the premises of licensed liquor dealers to "the county commissioners, sheriff of the county, and any deputy sheriff by him specially authorized, the chief of police of any city, or any policeman by him specially authorized."

Sec. 3007 empowers "selectmen in towns and the chief officer of police in cities" to license itinerant medical practitioners.

We find nothing in any of these general laws which requires any particular city to maintain an officer known by the special designation of "chief of police." As well might it be contended that section 1646 requires our cities or towns to maintain officers of police to be known as "marshals." The General Statutes undoubtedly contemplate the existence of some one official in each city who shall be the head of its police force, or in the language of section 3007, "the chief officer of police," but as to whether he shall be called inspector, or by any other name, is left to be determined by the municipal charter or ordinances under which the office may be created. *Opinion of the Justices*, 117 Mass., 603.

The reference to "the chief of police" and "the chief of said police department," in sections 62 and 63 of the Bridgeport charter, already mentioned, seems to us to impose no obligation on the common council to adopt either of these terms for the title of the chief officer of police. The state has dealt with his functions, not his name.

An ordinance which deprived the police department of any head would be contrary to the intent of the charter. Had the ordinance now in question abolished not only the office of chief of police, but also those of captain and lieutenant, and omitted to intrust the powers of chief to any other officer, it would have been void. Had it assumed to remove the incumbent of the office of chief of police while leaving the office itself still in existence, it would have been

void. *Samis* v. *King*, 40 Conn., 298, 309. But whether the powers and duties properly belonging to the head of the department were, by the ordinance as adopted, transferred to the captain of police from motives of economy, or to terminate an unseemly and long-continued wrangle over official appointments, or to secure any other possible end in the interests of good government, it is enough that they were transferred, and that such transfer was within the jurisdiction of the common council.

There was error in sustaining the demurrer to the fourth paragraph of the amended plea, and for that cause the judgment appealed from is reversed, and the cause remanded for further proceedings in conformity to this opinion respecting the matters alleged in said paragraph.

In this opinion TORRANCE, FENN and ROBINSON, JS., concurred. CARPENTER, J., dissented.