## THE STATE *vs.* MALCOLM R. GRISWOLD.

First Judicial District, Hartford, January Term, 1896. ANDREWS, C. J.,
TORRANCE, FENN, BALDWIN and HAMERSLEY, Js.

Immediately after the arrest of the defendant on a charge of arson, police
officers went to his place of business in the burned building, and with
the permission and assistance of his servant and agent in charge, but
without any search warrant, searched for and removed an envelope
containing two photographs which, by reason of the testimony given
by sundry witnesses, formed a piece of incriminatory evidence perti-
nent and admissible against him. This envelope with its contents was
offered in evidence by the State, in connection with the testimony of
said witnesses. The accused objected to its admission because of the
manner in which it had been found and taken from his office; claiming
that the seizure was in violation of § 8 of Art. 1 of the State Constitu-
tion, and that its admission would be to compel him to give evidence
against himself contrary to § 9 of the same article. The trial court
found that the accused was bound by the consent given by his agent,
that the search of his premises was not unreasonable, and that the
taking was not a seizure, and overruled the objection and admitted
the evidence. *Held* that even upon the assumption that the act of
the police officers was a trespass, the constitutional provisions referred
to did not render the evidence in question inadmissible.

Evidence otherwise pertinent and admissible will not be rejected because it
was taken from the possession of the accused by a trespass.

One accused of crime, who chooses to testify in his own behalf, subjects
himself to the same rules and tests as are applied to other witnesses;
and the extent to which he may be cross-examined, where such inquiry
tends to show that he has been guilty of willful falsehood in his direct
examination, is largely within the discretion of the trial court.

Experts called to testify as to their opinion of the hand-writing of dis-
puted documents when compared with admitted or proved standards,
cannot be cross-examined as to other writings of unknown authorship,
not pertinent to the case, merely to test their ability as experts.

[Argued January 9th—decided February 21st, 1896.]

INFORMATION for arson, brought to the Superior Court in
Hartford County and tried to the jury before *Prentice, J.;*
verdict and judgment of guilty, and appeal by the accused
for alleged errors in the rulings and charge of the court. *No·
error.*

The defendant was tried for the crime of arson at the
June criminal term of the Superior Court in Hartford county,

when the jury disagreed. He was again tried at the September criminal term, and was convicted. He then appealed to this court.

The finding of facts, so much of it as is necessary to present the questions made, is as follows:—

Upon the trial the State offered as a witness Dr. F. C. Jackson, who testified, among other things, that he was, and for many years had been, chief of the letter-carriers of the Hartford post-office; that between September, 1892, and November 15th, 1894, when he established an office of his own as a practicing dentist, his hours of absence from official duty were passed as a student and practitioner in the office of the accused, who was a practicing dentist in Hartford; that during all that period and down to the time of the latter's arrest, he, the accused, hired and had a box, No. 1003, in the Hartford post-office, which box was used by him the accused, in the conduct of a clandestine correspondence with a Mrs. Drake; that said box was hired under the assumed name of R. M. Thane; that about March 1st, 1893, the accused wrote in the presence of the witness, in a disguised hand, and signed Mrs. R. M. Thane, an order to the post-office authorities, directing that all letters received for the addresses of "Mrs. Mary L. Warden," or "Alleen E. Belton," be placed in said box, and gave said order to the witness to be duly filed at the post-office, which the witness did on the said March 1st; that said order continued in force until after March 15th last; that said names were names assumed by the accused for the purpose of this correspondence with Mrs. Drake, and that they represented him and no other person; that shortly after the witness entered the accused's office the latter gave the witness a key to said box and requested him, as he went to and fro, to get and bring to the accused all mail appearing therein; that witness did so thereafter and down to said March 15th.

Said witness further testified that the accused had at his office—being a portion of the burned premises described in the information—two pictures of Mrs. Drake; one a cabinet photograph and the other a tin-type, which he kept in a

closet behind a partition; that the accused had shown the
witness these pictures upon one or two occasions; that upon
one occasion the accused had told him to save them in the
event of a fire; that upon a later occasion, i. e., in August,
1894, the accused had told him that he, the accused, was
about to go upon a trip to Old Point Comfort with Mrs.
Drake, and that if anything happened to him so that he didn't
come back, to get the two pictures and put them out of the
way; and that the accused went away and was gone about
ten days; that early in the morning following the fire, being
March 15th, last, the witness met the accused in front of
the burned building; that during the conversation the
accused told the witness that there was a letter containing
some cards in the box, and asked him to get it and keep it
until he, the accused, called for it; that the witness, upon
arriving at the post-office, found in said box a letter ad-
dressed to "Mrs. R. M. Thane, P. O. Box 1003, Hartford,
Conn.," and bearing two stamps and the post-mark, "Hart-
ford, Conn., Mar. 14, 10 P. M., '95," signifying the time it
was mailed; that the envelope of this letter was about the
size and shape of a cabinet photograph, and that the exter-
nal face was a piece of brown paper pasted over the whole
surface of an old envelope which had been addressed to the
accused; that the witness kept this letter at his office until
Sunday the 17th, when the accused, being at the witness'
office, was asked by the witness if he had saved the photo-
graphs of Mrs. Drake from the fire, and he replied that they
were what was in the letter the witness had; that on Friday
the 22d (the witness having meanwhile, as the result of events
which had transpired, turned over to the authorities the in-
formation in his possession) he, for the purposes of the
prosecution, handed the letter which had remained in his
possession and was in the same condition in which it had
been received, and unopened, to Mr. Calhoun, the prosecut-
ing officer of the city; that upon Saturday, the 23d, the letter,
still apparently in the same condition, was returned by Mr.
Calhoun to the witness with instructions to return it to the
accused if he should ask for it, for the purpose of seeing

what he would do with it; that upon Sunday, the 24th, the accused came to the witness' office and made a detailed confession of the crime charged in the information, and in connection therewith a statement of his movements and whereabouts during the evening preceding the fire.

The first portion of this alleged confession, with its introduction, was testified to by Jackson in the following language :—

"Dr. Griswold took his inventory out of his pocket and began looking it over. I said, 'Doctor, I think you are taking a great deal of risk to swear to all that stuff which you know was not there.' He said, 'I am taking no risk at all; because such stuff as was saved I put into the inventory at a fair value, and such stuff as I didn't have I can say was burned up and went down that hole.' 'But,' I says, 'Doctor, they are liable to suspect you of setting the fire if you swear to all that.' He said, ' They can't suspect me, because I went home at half-past nine that night, and the fire didn't break out until half-past twelve; I can prove that by Gallivan, who went with me as far as Windsor street, and Mr. Mahon, who crossed over and spoke with me, and by my wife, who will testify I was home by ten o'clock.' I says, 'Doctor, did you go directly home from your office ?' He says, ' Yes, I did.' I said, ' Didn't you go to the post-office ? ' He said, ' No, I did not.' I said, ' When did you mail the letter containing the photographs of Mrs. Drake ? ' He said, 'I mailed them the next morning after the fire.' I said, ' Doctor, you are mistaken, that envelope is post-marked 10 P. M. the night of the fire.' He started and turned pale, and he could not speak for a few moments; when he did speak he said, ' Well, Jack, I may as well own up to you, I am in your hands; that letter was a loop-hole that I never thought of, and for the first time I have realized the truth of the old saying that women, rum, and fast horses are the ruination of many a man.' "

Said witness further testified that at the conclusion of this interview of the 24th, the accused asked for the letter, and that it was then, pursuant to the instructions of Mr. Calhoun

and for the purposes previously stated, returned to him with the suggestion or advice that he had better burn it, to which the accused replied that he would do so; and that said envelope was then unmutilated and in apparently the same condition in which it was taken from the post-office, and had the superscription, stamps, and post-office marks thereon, and in no way effaced.

Officers Umberfield and O'Malley were also sworn as witnesses, and testified that immediately after the accused's arrest, which was made upon the street about noon, Wednesday the 27th, they were, without knowledge of the accused and without a warrant of search, dispatched by the chief of police with instructions to search the accused's then office, to discover what might be there of an incriminating character, and went; that when they reached the office, which was open, they entered and found one Butler in apparent charge, and told him who they were and their errand; that they asked him if he was in charge of the office, that he replied that he was, and that he told them to go ahead; that they then made a search of the office, Butler at times assisting and aiding them; that they found, among other things, this envelope upon a shelf in a closet, concealed under some books; that it was still unopened, but in other respects the same as it was in court, to wit, with the post-marks and stamps removed and the face of the envelope and address partially mutilated. The State offered the envelope and the two inclosed pictures in evidence. Counsel for the accused objected to their admission, upon the ground that the seizure of them by the police and their production in evidence was in violation of the constitutional guaranty that the people shall be secure in their persons, houses, papers, and possessions, from unreasonable searches or seizures; and in violation of the further constitutional provision that an accused person shall not be compelled to give evidence against himself.

Counsel for the accused then asked that the court, before ruling, permit them to put the accused upon the stand for the purpose of showing that said Butler was not, in fact, in

charge of said office at the time of said search. Dr. Griswold thereupon was examined by his counsel, and cross-examined upon the subject. The court found upon the evidence that said Butler, who was a student in the accused's office, was in charge of it at said time, and admitted said envelope and pictures. Counsel for the accused excepted.

The accused having denied when upon the witness stand that he had directed said envelope containing the pictures to himself under the assumed name of Mrs. R. M. Thane, and that he hired or had said post-office box 1003 for himself under the assumed name of R. M. Thane, and that the letters directed to R. M. Thane or Mrs. R. M. Thane, post-office box 1003, and which were placed in said box, were intended for him, or were taken therefrom by him or delivered to him for himself, and that he had anything to do with said box except to forward the mail therein to Mr. or Mrs. R. M. Thane, and sometimes to send letters to Mrs. Drake; and having denied that he had ever gone under the assumed name of R. M. Thane or Mrs. R. M. Thane, or used said names or either of them ; and having testified that there were such persons as R. M. Thane or Mrs. R. M. Thane, although he did not know where they were and never knew where they lived, and that these persons were the ones for whom said box was rented and to whom the mail thereto was forwarded ; and having testified that said envelope containing said pictures was addressed by him to the address of Mrs. R. M. Thane, and thus directly deposited by him in the post-office at the request of Mrs. Drake, who had a key to said box, and that said envelope and contents were intended for her and were to be taken from said box by her, —the attorney for the State upon cross-examination, for the purpose of proving that the testimony of the accused that he hadn't assumed the name of Mr. or Mrs. R. M. Thane, and that he hadn't directed said envelope to himself under the assumed name of Mrs. R. M. Thane, was false; and for the purpose of identifying him as R. M. Thane, and for the purpose of disproving the testimony of the accused that there were such persons other than himself, as R. M. Thane or

Mrs. R. M. Thane, and as being pertinent to the examination which had preceded, asked the accused the following questions, to some of which counsel for the accused objected, upon the ground that they were irrelevant and immaterial. The court admitted the questions and the accused excepted.

This portion of the cross-examination was as follows:—

"Q. (By Mr. Eggleston) You say that name is not your name—Mrs. R. M. Thane or R. M. Thane is not your name? Ans. I say that is not meant for me.

"Q. And not the name under which you went and have been? Ans. Yes, sir, I say so.

"Q. Haven't you traveled under the name of R. M. Thane and wife? Ans. I do not know as that has anything to do with the trial.

"Q. Haven't you traveled under the name of R. M. Thane and wife? Ans. I want to know whether I am being tried for fornication or arson?"

"The Court.—Answer the question that is put to you."

"Q. You have traveled, yourself, under the name of R. M. Thane? Ans. Yes, sir, I have.

"Q. Traveled under the name of R. M. Thane and wife with a woman that was not your wife? Ans. I have; yes, sir.

"Q. How did you happen to take this name if it was not yours? Ans. It was convenient to use it.

"Q. It was convenient to use it? Ans. Yes, sir.

"Q. You went to Old Point Comfort under it, didn't you? Ans. I did, sir.

"Q. Went on the steamer *Yorktown?* Ans. I did.

"Q. Hired a stateroom under the name of R. M. Thane and wife?" Objected to as irrelevant and immaterial, overruled and exception taken.

"Q. You say you went to Old Point Comfort. What month did you go in?" Objected to; overruled; exception. "Ans. I went in the month of August, 1894.

"Q. Who went with you as Mrs. R. M. Thane?" Objected to; overruled; exception.

"Q. Who was it? Ans. I do not know her name; I picked her up in New York.

State *v.* Griswold.

" Q. Where did you pick her up?" Objected to, over-
ruled; exception.  Ans. I cannot tell you where I picked
her up; it was on the street.

" Q. Didn't you say that you didn't remember at the last
trial?" Objected to; overruled, and exception.  Ans. (No
answer.)

" Q. Under what name did you travel?  Ans. Under the
name of R. M. Thane and wife.

" Q. Didn't you say at the last trial you didn't remember?
Ans. Possibly I said so.

" Q. What hotel did you put up at?" Objected to, over-
ruled; exception.  " Ans. Sherwood House.

" Q. Didn't you say at the last trial you didn't remember?
Ans. Possibly.

" Q. Don't you know you put up at the Hotel Sherwood,
and wasn't your answer, I don't remember?  Ans. I don't
recollect what I did say at the last trial.

" Q. How did you register?" Objected to; overruled;
exception.  Ans. (No answer.)

" Q. What boat did you go on?" Objected to; over-
ruled; exception.  " Ans. I don't believe I can remember
the name.

" Q. You said before, I don't remember?  Ans. I don't
believe I do.

" Q. You went up the Potomac to Washington, didn't
you?" Objected to; overruled; exception.  " Ans. Yes, sir,
I went up the Potomac to Washington.

" Q. You said before you didn't remember, didn't you?
Ans. I do not recollect what I did say before.

" Q. Didn't I ask you if you went up the Potomac to Wash-
ington, and your answer was, I don't remember?  Ans. Pos-
sibly.

" Q. Did you go to Washington?" Objected to; over-
ruled; exception.  " Ans. I did so.

" Q. Didn't you say before, I don't remember.  Ans. I
don't recollect what I did say before; possibly.

" Q. The question came, ' Don't remember whether you

did or not?' And your answer was, 'No, sir.' Remember that? Ans. I don't recall what I did say before.

"Q. What hotel did you stop at in Washington?" Objected to; overruled; exception. "Ans. (No answer.)

"Q. All the way around on that trip you traveled under the name of R. M. Thane and wife, didn't you? Ans. No, sir, I didn't. I put up at the hotels as M. R. Griswold and wife.

"Q. What hotel did you say you put up at in Washington?" Objected to; overruled; exception. "Ans. At the Oxford.

"Q. When you left on that trip you bought two tickets here in Hartford?" Objected to; overruled; exception. "Ans. I did not."

"Q. You took two orders here for tickets; they were delivered to you in New York?" Objected to; overruled; exception. "Ans. I did.

"Q. And you sent down from here for a stateroom for R. M. Thane and wife?" Objected to; overruled; exception. "Ans. I did.

"Q. And you and this woman occupied this stateroom as R. M. Thane and wife; that is true, is it not? Ans. No, sir, I didn't. I was sick all night and on deck.

"Q. Between Old Point Comfort and Washington you occupied the same stateroom with this woman, didn't you, as R. M. Thane and wife?" Objected to.

"The Court.—I think I will let you pass that question. That might involve another matter."

"Q. Did you occupy the same room at the hotel with this woman that you went off with, with the name of R. M. Thane and wife?" Objected to; sustained.

"The Court.—You may inquire as to his registration and their conduct."

"Q. How did you register at the Oxford at Washington?" Objected to; overruled; exception. "Ans. M. R. Griswold and wife.

"Q. The woman wasn't your wife, you said?" Objected to; overruled; exception. Ans. (No Answer.)

" Q. She wasn't you wife, was she?    Ans. No, sir, she was not my wife."

As a part of the defense and for the purpose of showing that said witness Jackson had testified from improper motives, the accused introduced an anonymous letter, which he testified to having received by mail shortly before the first trial of the accused in June last, and of which he claimed Jackson was the writer.   To prove that the letter was in the handwriting of Jackson, the accused introduced as an expert in handwriting one Mr. Carvalho of New York, and presented to him certain admitted specimens of the handwriting of Jackson, which were laid in by the accused to be used as standards with which to compare the handwriting of said anonymous letter.

Upon the rebuttal, and for the purpose of rebutting the evidence of Mr. Carvalho that the writer of said standards and of said anonymous letter were one and the same person, the State introduced Messrs. Ames of New York and Fairbanks of Boston as witnesses, both of whom testified that they had for many years given a special study to the subject of handwriting and of the comparisons of handwritings, and had during their experience examined hundreds of cases of disputed handwriting for the purpose of giving their opinions in court as to the genuineness of such writings.   These witnesses, having qualified as experts upon handwriting, were allowed by the court to testify as such experts.   They testified that they had made a careful examination of said standards of comparison and of said anonymous letter, and a critical comparison of said letter with said standards, and that in their opinion the writer of said standards did not write and could not have written said anonymous letter.   Said opinions of said experts were based solely upon the comparison of said anonymous letter with said standards.

The accused having denied that he wrote the post-office order hereinbefore described, and having denied all knowledge of it, the State put in evidence admitted specimens of the handwriting of the accused, to be used as standards of comparison with which to compare the handwriting of said post-

office order, and asked said experts, Ames and Fairbanks, upon rebuttal, for their opinion, from such comparison, as to whether the handwriting of the post-office order was or was not that of the writer of the standards. Said experts testified that they had previously examined said standards of comparison and also said post-office order, and compared them, and each gave it as his opinion from such comparison that the writer of said standards wrote the post-office order.

Upon the cross-examination of the witness Fairbanks, counsel for the accused asked him, among other things, the following question: —

"Q. Now I want to call your attention to one other matter, and I shall ask you but a question or two about the post-office order (showing the witness two pages in defendant's Exhibit ' M '). In connection with the post-office order, I ask you whether you will say to the jury that the man who wrote these two pages didn't write the post-office order? Ans. I have never seen this book."

The cross-examination then proceeded as follows: —

"Q. For the purpose of testing your accuracy as an expert, and also for the purpose of calling your attention to the handwriting of the man whom we claim did write the post-office order, I show you pages marked A9 and A10 in defendant's Exhibit ' M,' and ask you to say whether in your judgment the same man who wrote those pages did not write the post-office order?" Objected to, excluded, and exception noted.

"Q. Now for the same purpose of testing your accuracy and ability as an expert in handwriting, I hand you a collection of slips of handwriting, marked for identification ' A7,' and ask you to examine them and tell me how many different handwritings you find there?" Objected to, excluded, and exception taken.

"Q. For the same purpose as before I show you a collection of slips of paper containing handwritings, marked for identification ' A8,' and ask you to tell me whether or not they were all written by the same person, or by different persons, and if by different persons, how many?" Objected to, excluded, and exception taken.

The finding concludes as follows: — "Defendant's Exhibit M was a memorandum book, two pages of which were in evidence. These two pages, being neither 'A9' nor 'A10,' were testified to by a witness Church, as having been written by him. The remaining matter in the book did not relate to the case (as counsel stated) and was not in evidence. Concerning this matter said witness Church testified that it was not written by him. By whom it was written was not in evidence.

" The claim that the post-office order was written by the writer of pages 'A9' and 'A10' in said Exhibit M, and the claim that Gallivan wrote the post-office order, were ones not made at any other time during the trial and never suggested save in said question to said Fairbanks, and in the discussion to the court, at that time.

" The accused had denied that he wrote the order, but had presented no evidence as to who did. Gallivan, who was named in the discussion as the writer thereof, had testified for the accused, but had not testified that he wrote said order.

" The collections of slips of paper referred to as Exhibits 'A7' and 'A8,' for identification, were papers prepared for the occasion, and then first produced, and were not in evidence. No evidence had been given as to what they were, or whose handwriting they were in. No claim was made that they were pertinent to the case, save as they might be for the purpose of testing the ability of the witness, or that they were written by either Jackson or Griswold."

The defendant assigned three reasons of appeal:

1st. That the envelope and inventory seized by the officers of police were improperly admitted in evidence, because said seizure and production in evidence were in violation of the eighth and ninth sections of article 1 of the Constitution of this State. 2d. That the several questions stated in the finding of facts as having been asked of the defendant concerning his trip to Old Point Comfort, were inadmissible, because they were immaterial and irrelevant and calculated to prejudice the jury. 3d. That the questions asked by him of the

two experts—Ames and Fairbanks—to test their competency, were improperly excluded.

*William C. Case* and *Henry D. Mildeberger*, for the appellant (the accused).

The taking of the envelope and its contents by the policemen, constituted an unreasonable search and seizure, and in effect compelled the defendant to give evidence against himself, in violation of constitutional provisions. *Boyd* v. *United States*, 116 U. S., 616. The cases relied upon by the State do not touch the case at bar. Undoubtedly concealed weapons, liquors held for illegal sale, poisons, counterfeit money, burglar's tools, etc. may be seized and used in evidence; but these things are not " papers." Ordronaux, Const. Legis., 245, 246. The court erred in allowing the questions put to the defendant about his trip to Old Point Comfort. Arson at Hartford in 1895 and adultery at Old Point Comfort in 1894, are distinct and remote, both in time, surroundings, and character. *People* v. *Sharp*, 107 N. Y., 427; *Coleman* v. *People*, 55 id., 90; *State* v. *Jackson*, 132 Mass., 20, 21; *State* v. *Lapage*, 57 N. H., 245; *People* v. *Brown*, 72 N. Y., 573, 574; *State* v. *Pinkerton*, 79 Mich., 117; *State* v. *Carson*, 66 Me., 116; *Hayward* v. *People*, 96 Ill., 502; *Gifford* v. *People*, 87 id., 214; *Clark* v. *State*, 87 Ala., 480. The questions asked of the experts in handwriting were improperly excluded. They were put for the avowed purpose of discrediting their accuracy as experts. 7 Amer. & Eng. Ency. of Law, 514, and cases cited; 1 Wharton on Evidence (3d Ed.), 710.

*Arthur F. Eggleston*, State's Attorney, and *J. Gilbert Calhoun*, for the appellee (the State).

The alleged " unreasonable seizure " was not even a trespass. It was made with the consent and even with the assistance of the agent of the accused. It is immaterial that the agent exceeded his authority. *Hitchcock* v. *Holmes*, 43 Conn., 528. But even if the articles were obtained by a trespass, they still will not be rejected by the court, if they are

otherwise competent evidence. *Commonwealth* v. *Dana*, 2 Met., 337; *State* v. *Flynn*, 36 N. H., 70; *Giudrat* v. *People*, 138 Ill., 111; *Siebert* v. *People*, 143 id., 583; *Spies* v. *People*, 122 id., 1; *Commonwealth* v. *Brown*, 121 Mass., 81; *Chastang* v. *State*, 3 So. Rep., 304 (Ala.); *State* v. *Hoyt*, 47 Conn., 540; *Painter* v. *People*, 147 Ill., 466. The questions asked by the accused of the two experts—Ames and Fairbanks—to test their competency, were properly excluded. No reason can be suggested why the cross-examination of an expert should not be confined as much to the examination in chief as that of any other witness. *Odiorne* v. *Winkley*, 2 Gall., 53. The question, however, so far as handwriting is concerned, has already been raised and decided in the case of *Tyler* v. *Todd*, 36 Conn., 222. See also *Bacon* v. *Williams*, 13 Gray, 527; *Van Wyck* v. *McIntosh*, 14 N. Y., 447; *Bank* v. *Mudgett*, 44 id., 523; *Massey* v. *Farmers Nat. Bank*, 104 Ill., 332; *Howard* v. *Patrick*, 43 Mich., 128. The questions asked of the defendant concerning his trip to Old Point Comfort were admissible. *Norfolk* v. *Gaylord*, 28 Conn., 312; *Conners* v. *People*, 50 N. Y., 242; *Commonwealth* v. *Nichols*, 114 Mass., 286. But even if some of the questions were immaterial, it was within the discretion of the court to admit or reject them. *Steene* v. *Aylesworth*, 18 Conn., 251; *Chapman* v. *Loomis*, 36 id., 460; *Mahew* v. *Thayer*, 8 Gray, 176.

ANDREWS, C. J. The defendant was tried to the jury upon an information charging him with the crime of arson, and in another count with setting fire to the same building with the intent to defraud an insurance company. Among other testimony, the State offered evidence of certain acts done by the accused showing preparation for the fire, as well as his subsequent conduct apparently influenced by the fact that he had set the fire or had known that it was going to happen. To illustrate and explain this conduct, the State offered in evidence a small package consisting of the envelope with the marks upon it, and its contents, which are described in the finding. It is admitted—and the fact is so—that this package was in its nature pertinent and admissible to be laid

State v. Griswold.

before the jury, and in connection with it the other testimony in the case became highly incriminatory evidence against the accused. His counsel objected to its being shown in evidence. The counsel said this article ought not to be exhibited in evidence to the jury, because of the manner in which it was found in the room of the accused and taken therefrom by the police officers; that such taking and production in evidence was in violation of the eighth and ninth sections of article 1 of the Constitution of this State. When this objection was made the trial judge excused the jury, and in their absence proceeded himself to hear the evidence upon the question so raised. The accused testified and was cross-examined. Other witnesses were also heard, and upon the evidence so taken, the judge found that the office of the accused, at the time when this envelope was found by the police officers and taken away by them, was in the care and possession of one Butler, as the servant and agent of the accused; and that said Butler gave permission to the officers to enter the office, to make the said search therein, assisted them in making the search and consented to the taking away by them of the said articles. The judge thereupon admitted them to be laid in evidence before the jury.

This finding is, in effect, a decision that the search was not an unreasonable one, and that there was no "seizure" of anything; and that the accused must be holden to have consented to the taking away by the officers of the said articles. The evidence upon which this finding was made is not before us, and we are not able to review the finding, even if for any cause it was desirable to do so.

Counsel for the accused argue that this finding, although it shows that Butler was in charge of the defendant's office at the time, does not show that he was the agent of the defendant for the purpose of admitting the police officers and consenting to the search and to the taking away of the said articles. We must assume, notwithstanding this argument, that the precise objection made in this court was made in the Superior Court and decided adversely to the defendant; otherwise the defendant has no standing to be heard here.

State *v.* Griswold.

This finding of the Superior Court might, perhaps, be treated as decisive of the first reason of appeal, because it shows that there has been no violation of the Constitution of this State, or of the United States.

We do not, however, place our decision on this ground alone. A constitution is that body of rules and maxims in accordance with which the powers of sovereignty are habitually exercised; and its provisions are the rule of conduct for those branches of the government which exercise the sovereign power. Both the sections cited by the defendant, have reference to the security of the citizen as to his possessions and as to his person. The eighth section forbids the legislature to enact any statute, and the courts from passing any rule, which would authorize any unreasonable search or seizure of the goods of a citizen. And the ninth forbids any legislation or rule of court which would compel any one accused of a crime to give evidence against himself. In this respect neither of the sections so cited have any application to this case. The act of the police was not directed, nor is it sought to be justified, by any statute or by any rule of any court. The theory of the defendant is that that act was a trespass. For the present purposes that theory may be granted to be the true one. And what then? The police officers would be liable in a proper action to pay to the defendant all damage they had done him. But that consequence does not affect the question now before us. It does, however, show that the eighth section of article 1 has no bearing upon the facts of this case. Indeed the defendant hardly claims that the eighth section alone affects his objection. But he does claim that a search or a seizure may be so made, that the production in evidence of any of his goods or possessions taken, is to compel the accused to furnish evidence against himself; and in that way to become a violation of the ninth section of the first article of the Constitution. This might be the result where the private papers of a suspected person were seized in order to be read to the jury as incriminating evidence against him. To reach this result the word "papers" in the eighth section of article 1 must be

taken to mean writings,—not pieces. of paper as mere inanimate goods, but papers on which are written or printed words that may be shown in evidence as the words of the suspected man. In this sense a search or seizure of the " papers " of a citizen might be unreasonable, because it might lead to a violation of the provisions of the ninth section. In *Boyd* v. *The U. S.*, 116 U. S., 616, an Act of Congress was held to be unconstitutional, because it required the party to produce his books, invoices and papers, and because the " entries " in the books, invoices and papers so produced, were to be made evidence against him. See also Ordronaux, Const. Legislation, 247; 1 Hare's Amer. Const. Law, 531. It was against the seizure of " papers," using that word in the sense just mentioned, that the vigor of LORD CAMDEN's opinion in *Entinck* v. *Carrington*, 19 How. St. Tr., 1029, was directed.

The package here shown to the jury was an envelope with certain inclosures,—a simple piece of the defendant's personal property; having of itself no voice or meaning so far as his guilt or innocence was concerned, any more than if it had been a lump of clay, or a block of senseless wood. It made no statement. It gave no evidence. Its presence or absence on the trial, if it had stood alone, would have signified nothing. It was his conduct in respect to this piece of property, both before and after the fire, his extreme solicitude to save it from destruction, which was incriminating. This conduct was detailed to the jury by sundry witnesses, and to their testimony no objection was made. We think no constitutional provision was violated by permitting the jury to see the envelope. And even if it had been taken from the possession of the defendant by a trespass, as he claims, that would have been no valid objection to its admissibility. 1 Greenleaf's Ev., § 254 a ; Wharton's Crim. Ev., § 678 ; *Commonwealth* v. *Dana*, 2 Met., 329 ; *Legatt* v. *Tollervey*, 14 East, 302 ; *Jordan* v. *Lewis*, ibid., 305 (n.) ; Phillips on Evidence, p. 426 ; *State* v. *Jones*, 54 Mo., 478 ; *State* v. *Garrett*, 71 N. Car., 85 ; *State* v. *Flynn*, 36 N. H., 64, 70 ; *Commonwealth* v. *Tibbetts*, 157 Mass., 519, 521 ; *Commonwealth* v.

*Brown,* 121 id., 69, 81; *Commonwealth* v. *Welch,* 163 id., 372; *Commonwealth* v. *Brelsford,* 161 id., 61; *Chastang* v. *The State,* 83 Ala., 29; *Spicer* v. *The State,* 69 id., 159; *Sampson* v. *The State,* 54 id., 241; *Siebert* v. *People,* 143 Ill., 571; *Gindrat* v. *People,* 138 id., 103, 111; *Painter* v. *People,* 147 id., 444, 466.

The defendant further insists that the trial court erred in permitting certain questions to be asked of him on cross-examination, concerning his trip to Old Point Comfort. The statute of this State permits any person on trial for a criminal offense, at his own option to testify. The defendant chose to avail himself of this privilege. By so doing he subjected himself to the same rules, and was called upon to submit to the same tests, which could by law be applied to other witnesses. Having availed himself of the privilege of the statute, he assumed the burden necessarily incident to the position. Having elected to become a witness in his own behalf, he occupied for the time being the position of any other witness, with all its duties and obligations. *State* v. *Green,* 35 Conn., 203; *State* v. *Ober,* 52 N. H., 459; *Commonwealth* v. *Smith,* 163 Mass., 411, 431; *Commonwealth* v. *Mullen,* 97 id., 545; *McGarry* v. *The People,* 2 Lans., 227; *Connors* v. *The People,* 50 N. Y., 240.

All cross-examination is intended to afford the jury or the court a test by which to weigh the testimony that the witness has given. In this case the cross-examination of the defendant tended to show that he had made a willfully untrue statement in his direct examination. It was proper that the questions should go far enough to make it entirely clear whether there had been such an untrue statement or not. We think it was fairly within the discretion of the court to permit the questions to which objection was made; not because they tended to show adultery in another State, but because they tended to show perjury on the trial then in progress.

The questions asked in cross-examination of the witnesses Ames and Fairbanks were properly excluded, and for the reason assigned by the trial court: that they would raise a

collateral issue.   Take one instance to illustrate all : The witness Fairbanks was shown a collection of slips of paper, on each of which there was handwriting, and he was asked, "How many handwritings do you find there?"   These pieces of paper had not been in the case; the writing on them was not admitted or claimed to be that of the defendant or of the witness Jackson.   Any possible answer that the witness might have given to the question would have been utterly meaningless, unless other evidence was admitted to show that the answer was incorrect.   And then the door would be opened to an unlimited inquiry, collateral to the question on which the jury was to pass.   1 Greenl. Ev. § 449; *Tyler* v. *Todd*, 36 Conn., 218, 222; *Bacon* v. *Williams*, 13 Gray, 525; *Odiorne* v. *Winkley*, 2 Gall., 51, 53.

There is no error.

In this opinion FENN and HAMERSLEY, Js., concurred.

BALDWIN, J. (concurring in the result).   I concur in the foregoing opinion, except with respect to its treatment of the point of constitutional law, which would have arisen, had not the defendant, by his authorized agent, consented to the search of his rooms and the seizure of his papers and effects.

The Constitution of Connecticut was ordained, as its preamble declares, in order more effectually to define, secure, and perpetuate the liberties, rights, and privileges which its people had derived from their ancestors, and among the "great and essential principles of liberty and free government" which they thought it necessary to include in their Declaration of Rights, is that defined in its eighth section, in the following terms:

" The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures ; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

This constitutes one of the fundamental conditions under

which the powers of government in this State can be exercised by those in authority. *State* v. *Conlon*, 65 Conn., 478, 489. The language in which it is expressed was probably adopted from that in the Declaration of Rights of the Constitution of Mississippi (Art. 1, § 9, 2 Poole's Charters and Constitutions, 1055), which had been framed in the preceding year, and is somewhat more precise and explicit than that of the fourth amendment to the Constitution of the United States. To determine what searches and seizures are to be deemed unreasonable, we must look back to events, then not far distant, in the history of the English people. Few judicial precedents had been more familiar in the American colonies than those furnished by the decisions of LORD MANSFIELD and LORD CAMDEN, which denied the validity of general search warrants. In one of these, the court had said that " papers are often the dearest property a man can have," and that " the law never forces evidence from the party in whose power it is." *Entinck* v. *Carrington*, 2 Wils., 275, 291, 292. That case was the leading authority upon which, in 1814, this court relied in holding that the magistrate who signed and the officer who served a general warrant to search for certain stolen goods in any suspected place in the town of Wilton, and to arrest all persons suspected of the theft, were both liable as trespassers to a person arrested. *Grumon* v. *Raymond*, 1 Conn., 40. It is not, says JUDGE COOLEY, " allowable to invade one's privacy for the sole purpose of obtaining evidence against him, except in a few special cases where that which is the subject of the crime is supposed to be concealed, and the public or the complainant has an interest in it or in its destruction. . . . The fourth amendment to the Constitution of the United States, found also in many State constitutions, would clearly preclude the seizure of one's papers in order to obtain evidence against him ; and the spirit of the fifth amendment—that no person shall be compelled in a criminal case to give evidence against himself—would also forbid such seizure." Cooley's Const. Lim. (6th Ed.), p. 370.

It does not seem to me that the prohibitions of the eighth

section of our Declarations of Rights can be properly read as applying only to acts of legislation or rules of court. The powers of the State are distributed (Const., Art. II.) between three separate magistracies, to one of which are confided those which are executive. The supreme executive power is vested in the Governor (Art. IV.), and among the inferior executive offices for which provision is made is that of sheriff (Art. IV., § 20). . The police officers appointed by our different municipal corporations are, as fully as the sheriff of the county, officers of the law, charged with the execution of a trust confided to them for and by authority of the State. *State ex rel. Rylands* v. *Pinkerman*, 63 Conn., 176, 182. They represent its sovereignty, within their proper sphere of action. They are its immediate agents for the detection and arrest of offenders against its laws. The English precedents which established the doctrine upon which these constitutional guaranties are based, grew out of arrests and seizures made under warrants issued by direction of executive officers of the government, and not resting upon any statute or rule of court. It is from that quarter, it appears to me, more than from any other,. that danger is to be anticipated. The common law was ready to supply a remedy for any unreasonable search or seizure, by an action of trespass against the individuals who made it. Our Declaration of Rights would be meaningless if it did not seek to do more than this. Its guaranties were designed to protect the citizen against the State, that is, against any and every officer claiming to act under its authority ; and to do so in a way that would repress the wrongful act most efficiently. Upon the trial of a civil action between private individuals, either can introduce any relevant paper in evidence, notwithstanding he may have obtained it in a manner not warranted by law. *Legatt* v. *Tollervey*, 14 East, 302; *Jordan* v. *Lewis*, ibid., 306. If the constitutional guaranty now under consideration is to be liberally interpreted in favor of the citizen, it would be difficult to apply the principle of such decisions to criminal prosecutions, supported by proof of papers illegally seized for that purpose, in the defendant's house, by public officers

State v. Griswold.

acting professedly as such, without seeming to allow the State to profit by its own wrong.

What was taken by the policemen from the defendant's rooms was a large envelope, containing a photograph and a tintype. Evidence was introduced by the State tending to show that it had been originally addressed by the defendant to " Mrs. R. M. Thane, P. O. Box 1003, Hartford, Conn.," and put in the mail by him at about 10 P. M. on the night of the fire, in order to preserve it from being burned; that this box No. 1003 was hired by him under the assumed name of R. M. Thane; that the envelope was taken by his agent, at his request, from the box the next morning, and afterwards given to him at his request; that it then bore a post-mark of 10 P. M., March 14; that his attention was then called to. the fact of this date and the proof it afforded of his having mailed it before that hour; and that when it was found, on the day of his arrest, in a closet, concealed under some books, the address had been partially mutilated and the postage stamps and post-mark removed. It seems to me that this envelope was one of the papers as well as one of the possessions of the defendant, and that it spoke loudly against him.

Whether its seizure would have been, under the circumstances, unreasonable, in the absence of authority from the defendant's agent, I consider it unnecessary for us to determine, in view of the fact that such authority existed. It presents a question of the utmost gravity, in its bearing, on the one hand, upon the methods of detecting crime, and on the other, upon the liberty of the individual and the inviolability of home. Lieber's Civil Liberty and Self Government, 63. It would seem to me wiser to postpone any decision upon this subject, until a case arises which imperatively requires it.

In this opinion TORRANCE, J., concurred.