THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
ANDREW BULNA, DEFENDANT-RESPONDENT.

Argued March 18, 1958—Decided May 19, 1958.

94

Mr. *Thomas S. O'Brien* argued the cause for the appellant (Mr. *Guy W. Calissi,* attorney; Mr. *William C. Brudnick,* on the brief).

Mr. *David Cohn* argued the cause for respondent (*Messrs. David & Albert L. Cohn,* attorneys).

The opinion of the court was delivered by

WACHENFELD, J. The defendant, Andrew Bulna, was convicted of forging an assignment of a certificate of ownership of an automobile owned by his wife, Mary Bulna, with intent to "prejudice, injure, damage and defraud the said Mary Bulna, contrary to the provisions of *N. J. S. 2A*:109–1."

The Appellate Division reversed on the ground that the trial judge had unduly restricted the defendant's right to cross-examine a handwriting expert produced on behalf of the State, holding:

"Under all the circumstances, particularly the heavy dependence of the verdict of conviction upon the testimony of the expert, Murphy, we are of the conviction that the disallowance of any cross-examination whatever for the purpose proposed by defendant was a material curtailment of his rights, calling for a new trial as a matter of substantial justice." *State v. Bulna, 46 N. J. Super.* 313, 322 (1957).

We granted the State's petition for certification.

Andrew Bulna and his wife Mary lived with their four children in Clifton, New Jersey, until the latter part of 1955, when they separated, the wife going to live in Passaic and the defendant moving into his mother's home in East Paterson. He assumed sole custody of three of the children while his wife took the fourth. About seven months thereafter, Mary disappeared completely and has not been seen or heard from since.

According to the records of the State Motor Vehicle Division, on March 16, 1956 title to a 1950 Dodge automobile was transferred from City Motors Sales, Inc., to Mary Bulna, and subsequently, on July 27, 1956, approximately the date of her disappearance, assigned by her to one John Bowman. On that same day a certificate of ownership was issued to John Bowman at the Haledon agency of the Motor Vehicle Division.

Defendant testified that his wife had spent the night of either—it is not clear which—July 26 or 27, 1956 at his mother's home and had departed in the early morning of the 27 or 28. Another witness, whom Mary had been visiting, stated that she last saw Mary at 11 P. M. on July 26, 1956 when she left in her Dodge automobile with the youngest child.

On July 28, 1956 the vehicle in question was discovered by the East Paterson Police parked about three and a half blocks from the defendant's residence. No one claimed it, but the subsequent police investigation disclosed that it was registered in the name of John Bowman, 267 Union Street, Hackensack. Further police inquiry was unsuccessful and indicated that the name and address on the registration were fictitious. John Bowman was never located or identified.

Thereafter, the Bergen County Prosecutor was notified that Mary Bulna was missing. During the investigation which ensued, defendant cooperated with the police and submitted to them specimens of his handwriting. He was subsequently indicted for forging his wife's signature to the document assigning her title to the 1950 Dodge to John Bowman. Conviction followed.

The State's case was based almost exclusively on the testimony of its handwriting expert, Francis D. Murphy, who stated the opinion that defendant had forged the signature "Mary J. Bulna" on the document assigning ownership of the Dodge to John Bowman. A number of attempts were made by defense counsel to test Murphy's competence as a handwriting expert, all of which were disallowed by the trial court.

The basic question presented on this appeal is whether, under any circumstances, a party should be permitted to attempt to impeach the competency of a handwriting expert and the value of his opinions by the use on cross-examination of writings not yet authenticated nor even part of the case.

Francis D. Murphy, the expert produced by the State, testified that in his opinion the handwriting samples prepared for the prosecutor's office by Andrew Bulna, and the signature "Mary J. Bulna" on the questioned assignment of title, had been written by the same hand. He also stated that the assignment had not been inscribed by the same person who had signed the name "Mary Bulna" on an automobile driver's renewal application and a passenger vehicle registration application, both dated July 13, 1953, and, under "Statement of Buyer," on an assignment of title, dated March 16, 1956, transferring ownership of a 1950 Dodge automobile from City Motors Sales Co., Inc., to Mrs. Bulna. When the defense presented its case, Andrew Bulna admitted that the signature on the July 27, 1956 assignment to "John Bowman" was not his wife's.

Mrs. Bulna's sister, Daisy Swintek, identified the signatures on the driver's license and registration applications of July 13, 1953 as those of Mary Bulna. There is no reason to doubt that Mrs. Bulna also signed, as buyer, the March 16, 1956 assignment to her by City Motors.

Murphy's testimony that Andrew Bulna had forged Mary Bulna's name on the purported assignment to "John Bowman" was the only evidence directly connecting defendant with the crime charged. It was not shown that Andrew Bulna had ever assumed possession of Mary Bulna's automobile nor that it was he who had obtained a new certificate of ownership in the name of "John Bowman" at the Haledon Motor Vehicle Agency.

In addition to cross-examining on the methods and criteria employed in analyzing and comparing handwriting specimens, defendant's counsel strove in the following ways to diminish or to destroy the influence of the opinions vouchsafed by the expert:

(1) he requested Murphy to write his own name twice on a piece of paper in an apparent effort to show that every one's signature varies substantially each time it is written and that, therefore, Mary Bulna might actually have executed the assignment to "Bowman" even though the signature thereon bore characteristics dissimilar from those of her earlier signatures on documents on file with the Division of Motor Vehicles;

(2) he proffered an envelope, not then in evidence but later admitted on the defendant's case as having been sent by Mary Bulna, addressed to Andrew Bulna, and attempted to interrogate Murphy as to whether there were differences between the handwriting on the envelope and Mary Bulna's signature on the City Motors assignment of March 16, 1956, hoping again to demonstrate that the same person's signature varies from time to time and that therefore the assignment to "Bowman" might not have been forged, despite the fact that the "Mary J. Bulna" thereon differed from Mrs. Bulna's earlier and presumably genuine signatures;

(3) he asked whether there was any distinction between the handwriting on a letter, not then in evidence but afterwards admitted during the defendant's presentation as having been written by Mary Bulna, and Mary Bulna's signature on the City Motors assignment of March 16, 1956, intending to discredit Murphy by subsequently proving that the letter had also been written by Mary Bulna if the expert had answered that the two writings were the product of different hands;

(4) he tendered two writings, exhibits D–3 and D–4, never accepted in evidence but admittedly containing his own signatures, and requested Murphy to state whether they had been prepared by the same person, hoping for a fallacious negative answer.

In each instance, defendant's endeavor, by utilizing handwriting specimens not in evidence, to test the skill of the expert and the validity of the opinions he had offered was thwarted by the trial judge. When defendant tried to

question Murphy regarding the envelope referred to in (2) above, the following exchange occurred:

"Mr. Galda: If your Honor please, I object.
The Court: I will sustain the objection.
Mr. Cohn: I want to note an objection. May I state the ground, your Honor, so maybe your Honor might reconsider it.
The Court: It is not necessary."

Defense counsel attempted to pursue the matter further:

"The Court: No. I just told you you cannot use that or refer to it in cross-examination of this witness.
Mr. Cohn: With respect to anything?
The Court: It is not in evidence in the first place.
Mr. Cohn: Well, it is cross-examination, your Honor.
The Court: You are not going to bring in side papers that he did not compare or consult with or use in his main case, and on his direct examination."

The trial judge adamantly refused throughout Murphy's cross-examination to permit the employment by defense counsel of handwriting samples not introduced by the State, and also denied counsel the opportunity to explain the origins of the specimens and the significance of their proposed use.

The problem of whether the qualifications of a handwriting expert may be tested on cross-examination by reference to specimens other than those put into evidence on direct and by asking him whether such specimens were made by the same hand as the writings already in issue, or by one or more hands, has been solved differently in various jurisdictions and the results attained are, for the most part, irreconcilable. In New Jersey, the inquiry seems to be one of first impression. See, however, *West v. State*, 22 *N. J. L.* 212, 239–240 (*Sup. Ct.* 1849).

■■ In most instances, the expert cannot be discredited without proof of the authorship of the test specimens utilized. For example, if, in the case *sub judice*, Murphy had erroneously testified that the letter referred to in (3) above was not in the handwriting of Mary Bulna, in order to confute him it would have been necessary for defendant to show

that, in fact, the letter had been written by his wife. For this reason, the majority of courts have completely prohibited the use on cross-examination of documents not in evidence nor admitted to be genuine, stating that their employment creates collateral issues of authenticity which delay the trial and confuse the jury. *E. g., State v. Griswold,* 67 *Conn.* 290, 34 *A.* 1046, 33 *L. R. A.* 227 (*Sup. Ct. Err.* 1896) ; *Nordyke v. State,* 213 *Ind.* 243, 11 *N. E.* 2d 165 (*Sup. Ct.* 1937) ; *State v. Maxwell,* 151 *Kan.* 951, 102 *P.* 2d 109, 128 *A. L. R.* 1315 (*Sup. Ct.* 1940) ; *Underwood v. Quantic,* 85 *Kan.* 111, 116 *P.* 361 (*Sup. Ct.* 1911).

The right to conduct cross-examination of this nature has also been denied upon the ground that it unfairly surprises the opposing party who has not been apprised of the writings to be used nor had the opportunity to prepare to counter such evidence. *Rose v. First Nat. Bank of Springfield,* 91 *Mo.* 399, 3 *S. W.* 876 (*Sup. Ct.* 1887) ; *Fourth Nat. Bank of Fayetteville v. McArthur,* 168 *N. C.* 48, 84 *S. E.* 39 (*Sup. Ct.* 1915).

The textwriters adhere to a view completely contrary to these cases, however. Wigmore states:

"There are thus two solutions possible. The *first* is to accept as valid these arguments of surprise, of danger of unfair selection, and of confusion of issues, and * * * to limit the use to specimens admitted genuine, to specimens already in the case, or the like. The *second* is to deny that these arguments, whatever their force as applied to the ordinary use of specimens, can here avail to cut off this method of testing opinions on cross-examination.

That the latter is the better course seems clear. The reason is that the deprivation of this weapon for the cross-examiner is a loss so serious as to outweigh the inconveniences of its sanction. When, for example, the witness has sworn positively that the disputed signature is genuine, and then, on examining a new signature submitted to him, he declares with equal positiveness that it is a forgery * * *, the testimony of a single unimpeachable witness that he saw the supposed forgery written by the person bearing that name disposes at once of the trustworthiness of the first witness and the certainty of his conclusion. In many other similar ways a single test of this sort will serve to demolish the most solid fabric of handwriting-testimony. There should be *no limitations whatever* on the power of employing these tests." (Emphasis supplied.) 7 *Wigmore, Evidence* (3d ed. 1940), § 2015.

Wharton also supports the theory that not only should such cross-examination be permitted but perhaps without restriction. 2 *Wharton, Criminal Evidence,* § 525 (*12th ed.* 1955), § 525.

There can be no question as to the relevancy of the proposed method of inquiry into the witness' qualifications. The results obtained may well be crucial in shaping the jury's verdict, especially where, as here, the expert's testimony is the principal evidence relied upon by the State to secure conviction. In *Hoag v. Wright,* 174 *N. Y.* 36, 66 *N. E.* 579, 63 *L. R. A.* 163 (1903), the New York Court of Appeals reversed and ordered a new trial because the trial court had not permitted defendant's attorney to show that plaintiff's handwriting experts had identified spurious signatures as being genuine. In the course of its opinion, the court stated:

"* * * While the court may properly restrict such evidence, it should not exclude it altogether. The good sense of the trial judge will confine it within proper bounds, and prevent an unnecessary consumption of time. It is better to take a little time to see whether the opinion of the witness is worth anything, rather than to hazard life, liberty, or property upon an opinion that is worth nothing. The evils and injustice arising from the use and abuse of opinion evidence in relation to handwriting are so grave that we feel compelled to depart from our own precedents to some extent, and to establish further safeguards for the protection of the public. As the hostility of witnesses to a party may be shown as an independent fact, although it protracts the trial by introducing a new issue, so, as we think, the incompetency of a professed expert may be shown in the same way and for the same reason; that is, because it demonstrates that testimony, otherwise persuasive, cannot be relied upon." (66 *N. E.* at *page* 581)

\* \* \* \* \* \* \* \*

"* * * Is not the competency of a witness upon handwriting always a relevant fact, inasmuch as his opinion is not relevant unless he is competent to express it? The competency of a witness is a fact necessary to be known in order to learn the value of his opinion. While it is not an issue raised by the pleadings, it becomes a subordinate issue by the tender of the witness as an expert. As the opinion may determine the main issue, the question whether the opinion is relevant—that is, whether it is the opinion of one legally qualified to give it—is necessarily an incidental issue, as otherwise the main issue might be decided upon an irrelevant fact. It is

incidental to the main issue, because it attacks the foundation of the evidence—and, it may be, the only evidence—received to establish the main issue. It is not enough to permit the opinion of an incompetent witness to be met by the opinion of a witness who is competent, for the jury may not be able, even when instructed by the cross-examination, to tell the good from the bad, unless they are guided by further evidence. It is for the trial judge to decide whether the witness, by his own evidence, has qualified himself to express an opinion, but it is for the jury 'to decide upon all the evidence, and under proper instructions from the court, whether he is in fact competent as an expert. If they find him incompetent, they should be told to disregard his opinion; but they cannot, in many cases, safely pass upon the question if they are limited to the evidence of the witness himself and to his own description and estimate of his qualifications. 'The value of an opinion does not depend upon the skill and knowledge professed by the witness, but upon the skill and knowledge which he actually possesses, and of the accuracy of such knowledge the jury must judge.' *Rogers, Expert Testimony,* 59." (66 *N. E.* at *page* 582)

In *Miller v. Trans Oil Co.,* 18 *N. J.* 407, 413 (1955), this court unanimously concluded that the requirements of justice and common sense demand that a jury be given the benefit of any facts which could, to even a small degree, assist "them in arriving at a correct solution of the factual equation confronting them." Although there we were discussing the admissibility of certain evidence, not the methods or permissible extent of cross-examination, the essence of the philosophy is pertinent here. The fundamental issue of what limitations should be placed on the various means of enlightening the jury is basically similar. If our approach in a civil case makes broad allowances, why should it be narrowed in a criminal matter where liberty itself is at stake?

The case *sub judice* amply demonstrates the potential, perhaps crucial, import of permitting cross-examination to proceed in the manner under discussion. There was almost complete dependence upon the testimony of the handwriting expert to secure conviction.

Script comparison is not an exact science, even with its recent improvements. There is still room for error. The exposure of a fallacious opinion as to genuineness would undoubtedly have turned the tide in defendant's favor.

■ There is little justification for barring absolutely the use on cross-examination of specimens whose authorship is, at that time, not specified. What may prove to be a devastating weapon in the service of the innocent should not be banned under any and all circumstances merely because of its inconveniences.

■ We are of the thought, as was the court in *Hoag v. Wright, supra,* that the trial judge should have discretion to determine whether the value of allowing cross-examination on the basis of handwriting specimens not in evidence or otherwise part of the case will outweigh its possible dangers, delays, and embarrassments. See *McCormick, Evidence,* § 172 (1954).

He can insure that the trial will not be unduly prolonged by limiting the number of specimens which may be produced. An expert witness, if it becomes necessary, can protect himself from imposition by requesting time in which to study the specimens submitted. The estimated length of the trial will bear upon the feasibility of this recourse, and, in general, the latitude permitted on cross-examination will expand and contract according to the significance of the expert testimony in the context of each particular trial.

The error committed below does not lie in an abuse of judicial discretion, but rather in a failure to use discretion at all under circumstances requiring its exercise. Defendant's attorney was flatly prohibited from using any specimens not introduced as part of the State's case on direct examination, and was also denied the opportunity to make any explanation concerning their origin or the purpose of their intended use. Where there should have been flexibility and liberality sufficient to permit a reasonable inquiry, there was none.

■■ The proposed test of having the expert write his own name twice on a piece of paper probably would not have added much, if anything, to the merits of the issue, and, in any event, easily lends itself to tedious and confusing repetition. This is likewise true of the attempt to impeach Murphy by asking him to compare the specimens of counsel's signatures on exhibits D–3 and D–4. There

was no error in prohibiting defendant from proceeding as outlined in (1) and (4) above. But he should have been allowed to use the other specimens in the manner and for the purposes described in (2) and (3).

■ The State contends, however, that *N. J. S.* 2*A*:82–1 prevents the utilization of specimens to test the credibility of a handwriting expert unless they are first proved to be genuine. The statute provides:

> "In all cases where the genuineness of any signature or writing is in dispute, comparison of the disputed signature or writing with any writing proved to the satisfaction of the court to be genuine shall be permitted to be made by the witnesses; and such writings and the testimony of witnesses respecting the same may be submitted to the court or jury as evidence of the genuineness or otherwise of the signature or writing in dispute;  *  *  *."

*N. J. S.* 2*A*:82–1 has no applicability in the situation *sub judice*. Apparently it was enacted to expand the common law methods of proving or disproving the genuineness of a writing. *Mutual Benefit Life Ins. Co. v. Brown*, 30 *N. J. Eq.* 193, 201 (*Ch.* 1878), affirmed 32 *N. J. Eq.* 809 (*E. & A.* 1880); *State v. Hauptmann*, 115 *N. J. L.* 412, 434 (*E. & A.* 1935), *certiorari* denied 296 *U. S.* 649, 56 *S. Ct.* 310, 80 *L. Ed.* 461 (1935). The common law in New Jersey did not permit proof of authenticity to be made by means of comparison except in the case of ancient documents. *West v. State, supra*.

The statute is permissive and expansive, not restrictive. It does not in any way purport to limit the means of testing the skill of a handwriting expert where the end in view is not to establish "the genuineness or otherwise of the signature or writing in dispute" but to impeach his qualifications.

The Appellate Division is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For reversal*—Justice HEHER—1.