## Commonwealth v. Street and Street. Commonwealth v. Cella.

*Intoxicating liquors—Unreasonable searches and seizures—Const., art. i, sect. 8—Act of March 27, 1923—National Prohibition Act of Oct. 28, 1919.*

1. Both the State legislation and the common law furnish authority to police officers to stop and, with or without warrant, to search motor-vehicles for contraband or other instrumentalities of crime.

2. The authority thus referred to is valid and lawful, and does not contravene the constitutional rights of citizens against unreasonable searches and seizures; the search of a motor-vehicle may not be unreasonable within the meaning of the Constitution, although a similar search of a stationary or permanent habitation might, under otherwise identical circumstances, be wholly unreasonable.

3. Even, however, if such search and seizure be unconstitutional, and, therefore, invalid, the physical evidence secured thereby as well as the testimony of the officers in regard to its discovery are competent evidence upon the trial of the criminal cause, and will not be excluded because of any alleged illegality in the method by which such evidence and testimony were obtained.

4. The Court of Quarter Sessions, which has jurisdiction on the trial of an indictment for the transportation and illegal possession of intoxicating liquors, also has jurisdiction to entertain a petition alleging that the searches and seizures of trucks, driven by defendants, were in violation of their constitutional rights, and praying that the District Attorney, Director of Public Safety, their assistants, detectives, etc., be restrained from offering in evidence at the trial any of the articles seized, and from testifying to the facts learned by them through such searches and seizures.

5. Officers of the law, being informed that beer was about to be transported from Philadelphia to New York in certain trucks, stopped the trucks. One of the drivers having admitted that his truck contained beer, the officers asked that all the trucks be opened, and discovered that each contained sixty half-barrels of beer, which was found to contain from 2.25 to 2.35 per cent. by volume of alcohol. The drivers of the trucks had not been violating any of the traffic regulations or committing any breach of the peace. The trucks were all closed in such a way that the contents were not visible, nor was there any odor of beer observable until after the search had proceeded. The officers had no search warrants or warrants of arrest. The defendants were arrested and subsequently indicted for the transportation and illegal possession of intoxicating liquors. When the cases were called for trial, the defendants presented petitions in each case, alleging that the searches and seizures of the trucks and their contents were in violation of their constitutional rights, and praying that the court restrain the District Attorney, Director of Public Safety, their assistants, officers and detectives, from offering at the trial any of the evidence or articles seized, and from testifying to any facts learned by them at the time of the search and seizure: *Held,* (1) That the Court of Quarter Sessions had jurisdiction to determine whether the trucks had been seized in violation of the defendants' constitutional rights; (2) that the search and seizure of the trucks without a warrant was not unreasonable within the meaning of the Constitution of Pennsylvania, art. i, § 8, which provides that the people shall be "secure in their persons, houses, papers and possessions from unreasonable searches and seizures," although a similar search of a stationary or permanent habitation might, under otherwise identical circumstances, be wholly unreasonable; (3) that, even if the search and seizure were invalid, the physical evidence secured thereby and the testimony of the officers in regard to its discovery would be competent upon the trial of the indictments; and (4) that the petitions should be dismissed.

Prohibition Enforcement Act of March 27, 1923, P. L. 34, and the National Prohibition Act, considered.

Petition to enjoin use in evidence of property seized in violation of defendants' constitutional rights. Q. S. Phila. Co., Sept. Sess., 1923, Nos. 690, 691 and 631.

*Joseph K. Willing, Charles E. Fox,* Assistant District Attorneys, and *Samuel P. Rotan,* District Attorney, for Commonwealth.

*Henry M. Stevenson,* for defendants.

STERN and GORDON, JJ., Dec. 10, 1923.—On Aug. 25, 1923, at about half-past one in the morning, Ernest Street, Alvin Street and Louis L. Cella, defendants in the above cases, were each driving a five-ton truck on the Roosevelt Boulevard, in Philadelphia. Three detectives, having received information that trucks of beer were going over the Boulevard to New York, stationed themselves at Castor Road and stopped the defendants' vehicles at that point. They announced to the drivers that they were officers of the law and asked them what they had on their trucks. Ernest Street and Louis E. Cella said that they did not know; Alvin Street said, "I've got beer." Thereupon the defendants were requested to open the trucks, which they did, and it was discovered that each truck contained a load of sixty half-barrels of beer, later upon analysis found to contain from 2.25 to 2.35 per cent. by volume of alcohol.

The testimony disclosed that at and immediately before the seizure and opening of the trucks the defendants had not been violating any of the traffic regulations or otherwise committing any apparent breach of the peace, that the trucks were all closed in such a manner that the contents were not visible, neither was there any odor of beer discernible until after the search had proceeded. It is also a fact admitted by the officers that they had no warrant of arrest or of search.

The defendants were arrested and indicted for the transportation and illegal possession of intoxicating liquor. When the cases were called for trial counsel for defendants presented petitions in each of the cases, alleging that the searches and seizures of the trucks and their contents were in violation of the Constitution and of the acts of assembly of the State of Pennsylvania, and praying that the court restrain the district attorney, the director of public safety, and their assistants, officers and detectives, from offering at the trial any of the evidence or articles seized as aforesaid, and from testifying to any facts learned by them at the time of said searches and seizures or in consequence thereof. The trial judge continued the trial of the cases until the prayer of the petitioners should be disposed of as a preliminary proceeding, and it is these petitions which are now before the court for consideration.

Counsel for the defendants conceded at the bar of the court in argument that the petition must fall as to the defendant Alvin Street, because, he having stated that he had beer on his truck, this admission in itself amounted to such reasonable and probable cause of belief that the law was being violated as to justify the officers in seizing and searching the truck. On the other hand, it is apparently conceded by the Commonwealth that, as to the two other defendants, the mere fact that when asked by the officers whether they would open the trucks, they said, "yes," and proceeded to do so, does not constitute such a voluntary acquiescence on their part as to amount to a waiver of their constitutional rights. This concession on the part of the Commonwealth is justified by the established principle that where an officer politely, decently and without physical threat has assumed to act in his official capacity, a peaceful citizen who does not forcibly resist the action, even though he knows the officer to be exceeding his authority, is held not to have acquiesced in the unlawful search or arrest: United States v. Slusser, 270 Fed. Repr. 818; United States v. Rembert, 284 Fed. Repr. 996, and cases there cited.

It is to be noted that the defendants' petitions do not ask that the seized liquor be returned. Defendants admit that, whether the search and seizure were lawful or unlawful, the liquor itself is contraband and the defendants have no property rights therein. The beer, by virtue of the National Prohibition Act (41 Stat. 305, Act of Oct. 28, 1919, ch. 85, title II, § 25) and the corre-

3 D. & C.

sponding act in our own State (Act of March 27, 1923, § 11a, P. L. 34), was forfeited the moment the defendants embarked upon the unlawful transportation, and, therefore, under no possible view of the case, have they any right to a return of the property seized. Moreover, there is no law requiring or justifying the return of property to any one whose possession of it constitutes a crime or whose use of it is only for the purpose of committing a crime: Rosanski v. State, 140 N. E. Repr. (Ohio) 370; People v. Case, 190 N. W. Repr. (Mich.) 289; People v. Bowen, 198 N. Y. Supp. 306; State v. Chuchola, 120 Atl. Repr. (Del.) 212; United States v. Kaplan, 286 Fed. Repr. 963; United States v. Fenton, 268 Fed. Repr. 221; United States v. O'Dowd, 273 Fed. Repr. 600; United States v. Dziadus, 289 Fed. Repr. 837; Pasch v. People, 209 Pac. Repr. (Colo.) 639; United States v. Alexander, 278 Fed. Repr. 308.

The Commonwealth, in its answers to the petitions, raises the question of the jurisdiction of the court, contending that the prayer is for an order in the nature of an injunction which can be made only by a court of equity. There exists, however, abundant authority for the proposition that the Court of Quarter Sessions which is charged with the trial of the cause can determine, and indeed alone can determine, the relevancy of the evidence presented for its consideration, can control the disposition of documents and other physical articles submitted or proposed to be submitted as evidence, and can direct the district attorney and other officers and witnesses presented by the Commonwealth with regard to testimony proposed to be offered by them. The property in question being seized under the claim of judicial process and thus brought under the control of the trial court is beyond reach of a writ of replevin or other remedy. Applications of the kind here involved have generally been treated as incidental to criminal prosecutions pending in the court to which they are made: Burdeau v. McDowell, 256 U. S. 465; United States v. Hee, 219 Fed. Repr. 1019; In re Chin K. Shue, 199 Fed. Repr. 282; United States v. Maresca, 266 Fed. Repr. 713; United States v. McHie, 194 Fed. Repr. 894; United States v. Friedberg, 233 Fed. Repr. 313; In re Weinstein, 271 Fed. Repr. 5; Weinstein v. Attorney-General, 271 Fed. Repr. 673; United States v. Mills, 185 Fed. Repr. 318; Wise v. Henkel, 220 U. S. 556; 1 Bishop on Criminal Procedure, § 210; Rex v. Barnett, 3 C. & P. 600; Rex v. Kinsey, 7 C. & P. 447. The state courts similarly offer a continuous course of precedents for the present practice.

The decision of these preliminary matters thus brings us to the main questions presented by the petitions, which we conceive to be three in number, namely:

1. Have police officers authority, either under legislative enactment or the principles of the common law, to make a search and seizure such as that which occurred in the present causes?

2. Assuming that such authority exists, is it valid in view of the constitutional provision regulating searches and seizures?

3. If the searches and seizures now in question were unconstitutional and, therefore, invalid, is the evidence obtained by the officers as a result thereof nevertheless admissible at the trial of the defendants?

1. The statutory authority justifying the action of the officers is that contained in the National Prohibition Act (41 Stat. 305, Act of Oct. 28, 1919, ch. 85, title II, § 26), which provides as follows: "When the commissioner, his assistants, inspectors or any officer of the law shall discover any person in the act of transporting, in violation of the law, intoxicating liquors in any wagon, buggy, automobile, water or air craft or other vehicle, it shall be his

duty to seize any and all intoxicating liquors found therein being transported contrary to law. Whenever intoxicating liquors transported or possessed illegally shall be seized by an officer, he shall take possession of the vehicle and team or automobile, boat, air or water craft, or any other conveyance, and shall arrest any person in charge thereof." And the state act of March 27, 1923, § 9, P. L. 34, which provides: "When any officer shall discover any person in the act of transporting, in violation of this act, intoxicating liquor in any wagon, buggy, motor-vehicle, water or air craft, or other vehicle or receptacle, or otherwise, it shall be his duty to seize any and all intoxicating liquor and container found therein, being transported contrary to law, with or without a warrant. Whenever intoxicating liquor, transported or possessed illegally, shall be so seized by any officer, he shall take possession of the vehicle and team, or motor-vehicle, boat, air or water craft, or any other conveyance or receptacle, and shall arrest any person in charge thereof."

It will thus be seen that the Pennsylvania statute expressly gives the right to an officer to make a seizure "with or without a warrant" if he shall "discover" the person in the act of transporting intoxicating liquor." The word "discover," which also appears in the Federal act, has been made the subject of extended discussion respecting its connotation as thus employed in this legislation. Some courts have taken the ground that by "discover" is meant that the officer without any preliminary manual action must actually see, hear or smell the liquor. This has resulted in a fineness of interpretation which makes the subject amusing. A bottle of liquor may be so inclosed as to make visual evidence of its existence impossible, and thus an officer would be denied the right of further examination in order to enforce the law and apprehend the lawbreaker. It is argued that if the liquor be so concealed in the passing automobile as to render it invisible, the officer is powerless to act, whereas if the cork of a bottle protrudes, or if a blanket be so carelessly placed over the contents of the vehicle as to allow a peep at the articles which it is intended to conceal, the officer is thereby afforded such reasonable and probable cause as to justify his further action. It is not believed that the practical and common sense nature of our people and of the law which that nature has through so many centuries developed will permit of such academic and fine-spun distinctions. As a matter of fact, the word "discover" has no such limited meaning. As defined in Webster's International Dictionary, it means to "uncover; to remove or lift (any covering); to lay open to view; to reveal; to make known; to show (what has been secret, unseen or unknown); to manifest; to show; exhibit; betray; to explore; examine; reconnoiter; to obtain for the first time sight or knowledge of, as of a thing existing already, but not perceived or known; to find out; to ascertain; espy; detect; descry." In other words, the essential nature of the word "discover" involves, not a facile observation, but rather a detection as the result of preliminary measures by way of uncovering, revealing and laying open to view. The very etymological analysis of the word would suggest an uncovering rather than a mere observation of something already exposed to the action of the senses.

We readily conclude, therefore, that both the Federal and state acts do not intend by the use of the word "discover" to limit the right of the officer to proceed only upon the evidence of the optic, auditory or olfactory nerves, but, on the contrary, were intended to and do give such right when a "discovery" is made as the result of an "uncovering," "revealing" or "exploring." Furthermore, the state act expressly provides (section 8) that "the right to a search warrant, as provided for in this section, shall be in addition to all other rights of search and seizure now existing under law," and at common law officers

3 D. & C.

have had the right from time immemorial to conduct reasonable searches and seizures without warrant.

We, therefore, have no hesitation in concluding that officers are vested with authority to make a search and seizure of the kind here in question unless prohibited by the Constitution of the State.

2. This, therefore, brings us to the second question in the case: Did the search and seizure here involved violate the constitutional rights of the defendants? If the state act be thus interpreted as conferring authority upon the officers of the law to the extent exercised in the present instance, is it unconstitutional, and does the Constitution also bar the common law rights of search and seizure above referred to? Incidentally, it may be noted that the 4th Amendment to the Federal Constitution does not apply to state laws.

Article I, section 8, of our State Constitution provides that "the people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant."

It is elementary that search warrants and warrants of arrest are not required in all cases. Arrests and searches and seizures without preliminary affidavits and warrants have long existed in practice. The only limitation prescribed in the Constitution is that such searches and seizures shall not be "unreasonable," and, therefore, the only question involved is whether the search and seizure here complained of was or was not "unreasonable."

We are not unaware of the importance and gravity of the question thus presented; on the contrary, we are impressed by the fact that it is but a phase of that conflict which has existed throughout history between the desire, on the one hand, for a strong and efficient police system, insuring safety to the citizens, and on the other, for a proper protection to those individual rights and liberties so dearly prized by the Anglo-Saxon people above all other races and nations. The constitutional right here invoked probably had its origin in the doctrine of the famous Wilkes Case (19 Howell's State Trials, 981), and that of Entick *v.* Carrington (19 Howell's State Trials, 1029), decided by Lord Camden in 1763 and 1765 respectively. The 4th Amendment, as written into the Federal Constitution, followed somewhat similar provisions in the Constitutions of Virginia and Massachusetts, largely resulting from the resentment caused by the Colonial authorities of Massachusetts Bay issuing general search warrants known as "writs of assistance," which were general commands to search for smuggled goods wherever it was suspected that such could be found. These writs were the subject of the great speech by James Otis in 1761 in Paxton's Case (Quincy's Reps. 51)—a landmark in American history which was characterized by John Adams as constituting the birth of the "child" Independence.*

The protection granted by the Constitution thus having its roots in revolutionary times and being a result of the colonists' experience with despotism, is not to be regarded lightly nor frittered away. On the other hand, while

---

* For a history of the origin of the constitutional provision, see note by Frank W. Grinnell, in the Massachusetts Law Quarterly for August, 1922, page 43, *et seq.*

The 4th and 5th Amendments to the Federal Constitution have an entirely different history, although they are often confused. The 5th Amendment is to be traced back to an agitation conducted in the sixteenth and seventeenth centuries, and especially to that of "Freeborn John" Lilburn.

vital principles are and ought to be unchangeable, regard must be had to the fact that in their application to changing conditions the security and consequent happiness of the body politic must be protected against an academically rigid interpretation of theoretical rights which those who originally enunciated the doctrine would be the first to disavow.

The importance of the question involved is augmented by the fact that it is in no sense confined to the temporary controversy now being waged around the enforcement of the liquor laws. The fact that intoxicating liquor is involved in the case at hand is merely casual and accidental. If the right here under investigation does or does not exist with regard to intoxicating liquor, it similarly does or; does not exist with regard to narcotic drugs, weapons of crime and other instrumentalities used by the criminal classes in the warfare constantly maintained by them against organized society. The right to stop and search an automobile for liquor is no different from the right to stop and search an automobile to see whether or not it contains an infernal machine, opium or a bandit concealed beneath a laprobe, or, indeed, to discover whether or not the operator of the vehicle has in his possession the license card provided by the automobile statutes of the State. The question, therefore, must be removed from the atmosphere of the prohibition acts into one of the general extent of the police power under similar circumstances.

Furthermore, the distinction must be borne in mind between the existence and the possible abuse of power. Any conceded power may be employed in such a tactless and arbitrary manner as to amount to oppression. A municipal department of public safety, if over-zealous in attempting to enforce any law, may justly provoke the citizens of a municipality into an attitude of irritation and opposition.

Having regard for these considerations as a background to the question for determination, the court believes that the search and seizure in the present cases was not unreasonable, and, therefore, not in violation of the Constitution, for the following reasons:

(a) In the first place, the very use of the term "unreasonable" in the Constitution showed an intent on the part of the framers to leave to future generations and varying circumstances the question as to what, under given conditions, is or is not an "unreasonable" search and seizure. The term is like that of "excessive bail," "excessive fines," "freedom of speech," "cruel and unusual punishment," etc. Whether a search is or is not unreasonable depends upon the circumstances, and is not influenced by the fact that it is without warrant. A search without warrant may be reasonable, and a search with warrant may be unreasonable: O'Connor v. United States, 281 Fed. Repr. 396; United States v. McBride, 287 Fed. Repr. 214; Agnello v. United States, 290 Fed. Repr. 671; United States v. Snyder, 278 Fed. Repr. 650. See, also, Wakely v. Hart, 6 Binney, 316. For example, nobody has ever doubted the reasonableness of searching persons and their baggage upon entering the country, even though they be citizens returning from a temporary sojourn abroad, and no one has ever asserted the necessity of a search warrant for such proceeding. So, with the greater development of social organization and complexities in industrial life, the bureaus and departments of government are constantly sending agents to search premises without specific warrants for the purpose of ascertaining whether factories or work-shops are employing child labor or unguarded machinery in violation of law; to inspect mines, elevators, fire-escapes, the manufacture of food-products and the like. These instances are cited merely to show that the question as to what is or is not

3 D. & C.

a reasonable search changes with the changing habits, conditions and views of society.

That being so, what is the situation with regard to the search of automobiles? These are a development of very modern times. To obtain a search warrant for use in connection with a fleeting automobile upon the highways is impossible, and yet, as every one knows, the automobiles have revolutionized crime and its possibilities. Unless the right to search vehicles without warrant exists, the subjecting of the community to the perpetration of crime is greatly intensified. The fact that it is convenient or desirable that this right should exist is, of course, not a conclusive argument that it does exist, but it is eminently a fair consideration in determining whether or not the exercise of it is "reasonable." This view of the matter is well expressed in People *v.* Case, 190 N. W. Repr. (Mich.) 289, where it is said: "The automobile is a swift and powerful vehicle of recent development, which has multiplied by quantity production and taken possession of our highways in battalions, until the slower, animal-drawn vehicles, with their easily noted individuality, are rare. Constructed as covered vehicles to standard form in immense quantities, and with a capacity for speed rivaling express trains, they furnish for successful commission of crime a disguising means of silent approach and swift escape unknown in the history of the world before their advent. The question of their police control and reasonable search on highways or other public places is a serious question far deeper and broader than their use in so-called 'bootlegging' or 'rum-running,' which in itself is no small matter. While a possession in the sense of private ownership, they are but a vehicle constructed for travel and transportation on highways. Their active use is not in homes nor on private premises, the privacy of which the law especially guards from search and seizure without process. The baffling extent to which they are successfully utilized to facilitate commission of crime of all degrees, from those against morality, chastity and decency to robbery, rape, burglary and murder is a matter of common knowledge. Upon that problem a condition and not a theory confronts proper administration of our criminal laws. Whether search of and seizure from an automobile upon a highway or other public place without a search warrant is unreasonable is, in its final analysis, to be determined as a judicial question, in view of all the circumstances under which it is made." See, also, United States *v.* Rembert, 284 Fed. Repr. 996; United States *v.* Bateman, 278 Fed. Repr. 231; Houck *v.* State, 140 N. E. Repr. (Ohio) 112.

We are impressed by the thought that the makers of the Constitution, in this, as in so many other clauses of that document, used general phraseology because they foresaw developments of civilization which would require adaptation of principles to necessities arising from changing conditions, and we believe that the search of an automobile without a warrant is not "unreasonable" within the meaning of the Constitution, although a similar search of a stationary or permanent habitation might, under otherwise identical circumstances, be wholly unreasonable.

(b) We arrive at the same conclusion from another aspect of the question with reference to the nature and use of automobiles. When the Constitution was adopted, the only subjects to which the 4th Amendment could apply were the persons of the individual citizens, their homes and their stores and warehouses. The rights of a person to privacy, to living in his home uninterrupted by official espionage, and to conducting the ordinary mercantile pursuits, were all antecedent in point of time to the organization of the Federal Government and to the formulation of its Constitution and laws. These rights

were what the eighteenth century French philosophers would have called "natural rights," and as such they were peculiarly the subject of protection against the despotism of organized society and of its official representatives. Automobiles, viewed from the standpoint of personal property, are in an entirely different position. No one has a right to operate a motor-vehicle upon the highways of the Commonwealth or of a municipality without a preliminary license granted by the State. No one needs such a license to live, to inhabit a home, or to transact most lines of industry. There are, however, certain activities—for example, the sale of liquor in pre-prohibition days, the conducting of a pawnshop, and the like—which cannot be carried on except by special permission, and as to which no one has a natural or inalienable right. The operation of a motor-vehicle is in this class. The automobile, an invention of recent origin, is peculiarly the subject of governmental control, and were this not so, modern life and society would be hopelessly imperiled. If, therefore, it be true, as it is true, that a citizen has no right to use or to operate an automobile at all without permission from the Commonwealth, it must follow that one must obtain such permission *cum onere*, that is, subject to such control or limitations as the State may see fit to impose upon its licensees as conditions precedent to its enjoyment. Can any one doubt, for example, that in granting a license the State may constitutionally provide, as in fact it does provide, that every operator of a motor-vehicle may be stopped at any time by an officer and made to exhibit his license card, and may even be compelled to write his name in the presence of the officer for the purpose of establishing his identity, or that any vehicle may be stopped by an officer for the purpose of inspecting it as to its equipment and operation and for securing "such other information as may be necessary?" Act of June 14, 1923, § 23, P. L. 718.

In short, the court is of opinion that the constitutional provision as to searches and seizures is quite distinguishable in its application to individuals, their habitations and business places on the one hand, and to motor-vehicles on the other, because the rights in the one case are entirely independent of government, and in the other are derived wholly from the state. And while we are not prepared to say that there are no limitations of the power of the state even under such circumstances, we are of opinion that in construing the constitutional clause as to the unreasonableness of searches and seizures, such construction is properly to be varied when applied to inalienable rights over which the state has no control, and when applied to those industries and kinds of property (including, as above pointed out, automobiles) as to which no rights exist except in so far as the state may see fit to confer them.

It must admitted that for the distinction thus drawn no authority in the law books as yet exists,* neither was it the subject of argument in the present case, but in principle it seems to the court to be fundamental and to be in accord with the doctrines of the common law and of constitutional interpretation.

*(c)* The next distinguishing feature in the present case which, in the opinion of the court, removes it from the constitutional inhibition, is the fact that the act of the officers under consideration was not directed to the securing of evidence of a crime committed, but to the actual suppression of a crime then in course of perpetration. It is, of course, an elementary legal principle that, a crime having been completed, no right of search or seizure on the part of

---

* An intimation, however, is to be found in the opinion of Stewart, P. J., in Com. *v.* Schwanda, 19 North. 37; s. c., 71 P. L. J. 529.

3 D. & C.

governmental agencies exists for the purpose of obtaining evidence which may be desired to prove the fact of the crime or the identity of the criminal who committed it. In the present case, however, when the officers stopped the automobiles, the operators of the vehicles were then and there in the midst of committing the crime of the illegal transportation of intoxicating liquor, and every revolution of the wheels of the trucks was a part of the perpetration of the offence. To hold, under such circumstances, that what the officers did was illegal would lead to this *reductio ad absurdum*, that the search having actually been made, the officers would be obliged, in effect, to apologize for their unwarranted interference and to allow the defendants to proceed upon their criminal journey. In other words, although then knowing that a crime was in progress, the officers would have no right to check it, but must allow the vehicles to proceed in a continued perpetration of the illegal act. It is difficult to see upon what principle, either of ordinary logic or intuitive common sense or legal authority, such a view is tenable. Suppose, for example, that a person, by reason of an unwarranted trespass upon another's property, happens to come into a room where a murder is being committed; will his unwarranted entry legally prevent his interposition to stop the crime? No matter how the information of the offence be obtained, whether by legal or illegal measures, can it be possible that there is anything in the law to disqualify the discoverer from taking all reasonable measures to prevent further infraction of the law? If, in the present case, the officers had allowed the defendants to proceed upon their way, would they not thereby have made themselves in effect accomplices or accessories to such part of the crime of the illegal transportation of intoxicating liquor as thereafter would have ensued in the continued journey of the trucks? And by what other method could the defendants be prevented from further violating the law than by the officers seizing the instrumentalities by which the crime was then and there being committed, namely, the automobiles themselves and their illegal contents?

We have here, therefore, the marked difference between a search and seizure of evidence of a past crime and the stopping of a crime in actual progress, and it is not believed that there is any intendment or implication in any constitutional provision which would tie the hands of police officers under such circumstances. This thought seems to have been the dominant one in the recent case of Com. v. Klein and Goodstein, 81 Pa. Superior Ct. 551, where it was said, per Mr. Justice Linn: "Appellants contend the seizure of the liquor was illegal, and that it was wrong to admit any of it in evidence. As no objection was made to this evidence during the trial, we might dismiss the assignment without further notice, but it is not apparent that it was objectionable; the parties were arrested, as the verdict establishes, committing a crime; it was proper to take and put in evidence the means by which they were committing it."

And to the same effect is the statement of the court in United States v. McBride, 287 Fed. Repr. 214: "Now we see that no warrant shall be issued but upon probable cause, etc. This certainly contemplates that a crime has been committed, and there is probable cause to believe that the defendant has committed it, or has certain things used in the commission of it, etc., which he is secreting, and describing the thing and place. Now, if the crime, instead of having been committed or completed, is only in the process of commission, it is manifest no warrant could be issued. There must be a completed crime, an affidavit of probable cause, and thing to be seized. This makes a complete analogy to a warrant for the arrest of a person for the commission of an

offence. If the offence has been committed, the officers must have a warrant to make the arrest; but if the offence is committed in his presence, he may arrest without a warrant. . . . The analogy between arresting and searching without a warrant is complete and rests on the same propositions, viz., the necessities of the case." See, also, State v. Pauley, 192 N. W. Repr. (N. Dak.) 91.

(d) Analogous to this distinction is the fact that there is a difference between the seizure of the evidence of a crime and that of the instrumentality by which a crime is committed.

In Heywood v. United States, 268 Fed. Repr. 795, it is said: "Not all searches and seizures are forbidden. Consider, first, the character of the property that may be seized. It has never been deemed unreasonable to hunt for and take stolen property, smuggled goods, implements of crime, and the like. Inasmuch as the documents in question were the tools by means of which the defendants were committing the felonies, there was no immunity in the nature of the property."

In City of Sioux Falls v. Walser, 187 N. W. Repr. (S. Dak.) 821, it is said: "There is a wide distinction between the seizure of property lawfully in the possession of a person and the seizure of property which is being held and used in violation of law, and in and to which property, because of such violation of law, the person in possession can claim no property rights."

In People v. Bowen, 198 N. Y. Supp. 306, it is said: "When stolen property shall have passed into the custody of the law and is held for the rightful owner, the thief may not question the right of the officers of the law to hold it or the manner of their acquiring its possession. So, too, officers of the law, coming into the possession of that which is used to commit crime, may not be compelled to restore it to him who claims its ownership, although the officers have obtained it from him by illegal means. A party may not rightfully have the possession of instrumentalities used for the commission of crime, or used in the commission of crime, and since he may not rightfully have the possession of such instrumentalities, he has not the right to require their possession. In the case under consideration the seizure was not illegal, for the reason that the papers seized, on the proofs presented on this motion, were instrumentalities used by the defendant in the perpetration of the crime with which he is charged. There is such a thing as unreasonable search, and this the law does not permit. Against this a man is protected; but when a man stands charged with crime, and the instruments are found upon his person or in his house, which were a part of the means by which he accomplished the crime, such instruments or papers are legitimate evidence against him, and may be taken from him and used for that purpose. If this be not so, the dagger with which the murderer strikes down his victim could not be taken from his pocket and used against him, for the reason that it belongs to him and is found upon his person."

In United States v. Welsh, 247 Fed. Repr. 239, it is said: "The cases quoted do not apply to the present situation. They only go so far as to hold that private books and papers cannot be seized and used as incriminating evidence. The corpus delicti itself has not, I think, been held incapable of detention and production to establish the crime. If the defendant is right, testimony of a witness of a murder, though furnishing the only evidence, would be excluded, and the corpse could not be presented before the coroner's jury, if the witness discovered the murder by rushing into a house without a search warrant, where he heard cries of distress. Here the letter is in no real sense the property of the defendant, but is the very unlawful thing imported contrary

3 D. & C.

to the statute. I think the district attorney is right in urging that any one could arrest the person carrying it, who was thus committing a felony in his presence. To be sure, the man making the arrest did not know that a felony was being committed. He took the risk of civil and perhaps criminal actions for assault and battery if his suspicions turned out to be without foundation; but in this case it appears on the face of the indictment and from the evidence adduced that the suspicions were well founded, and the defendant was engaged in the commission of a felony. The constitutional safeguards against self-incrimination do not prevent the arrest of men engaged in the commission of crimes, or the seizure of property whereby the crime is being effected."

In Boyd v. United States, 116 U. S. 616, it is said: "The search for and seizure of stolen or forfeited goods or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him. The two things differ toto coelo. In the one case, the Government is entitled to the possession of the property; in the other it is not."

In United States v. McBride, 287 Fed. Repr. 214, it is said: "In considering what may be seized, the law draws a clear distinction between things forfeited, or that it was illegal for the person to have, and his mere private books and papers, etc., which contained evidence that could be used against him, permitting the seizure of the first and denying it as to the latter, though both were held in the same way. Such things as might be seized could be admitted in evidence over defendant's objection, though they were taken from his possession and against his consent. . . . So we see that it is not the fact that the thing was taken from his possession and against his consent that was forbidden, but it was the character of the things taken and the method of taking. Such a thing as burglar tools, though bought or made by defendant, and belonging to him as much as his private books and papers, could be taken and used against him, and it was not compelling him to be a witness against himself to take them from him." See, also, State v. Pauley, 192 N. W. Repr. (N. Dak.) 91; Com. v. Klein and Goodstein, 81 Pa. Superior Ct. 551; State v. Krinski, 62 Atl. Repr. (Vt.) 37; State v. Simmons, 183 N. C. 684; State v. Chuchola, 120 Atl. Repr. (Del.) 212.

Thus we see that there is a well-established distinction in regard to a search or seizure the object and the result of which is to take private property in itself legitimate, but constituting evidence of the commission of a crime, and property the possession of which is unlawful because constituting the very instrumentality for the commission of the crime, as, for example, a burglar's tools, gambling devices, narcotic drugs, and the like. And, of course, intoxicating liquor falls within the latter class. It is, under the provisions of both the Federal and state acts, contraband. As said in People v. Case, 190 N. W. (Mich.) 289: "When its illegal possession or transportation begins, it at once becomes the property of the state. One searching for and seizing it does not search and seize property of the person in illegal possession, and if the state makes the seizure, it is but taking possession of its own property." To the same effect are O'Connor v. United States, 281 Fed. Repr. 396; United States v. Fenton, 268 Fed. Repr. 221; United States v. O'Dowd, 273 Fed. Repr. 600; United States v. Hilsinger, 284 Fed. Repr. 585; United States v. Bateman, 278 Fed. Repr. 231; United States v. Snyder, 278 Fed. Repr. 650.

The conclusion, therefore, is that a search which is directed toward the obtaining of mere evidence is different from one directed toward the seizure

of contraband or unlawful property, and a search for the latter may be reasonable in cases where a search for the former is not.

3. It has thus been demonstrated, in the opinion of the court, that searches and seizures of the kind involved in the present controversy are not unreasonable, and, therefore, not unconstitutional, because of the four reasons above pointed out, namely, (1) that the nature of the use of automobiles makes it impossible to employ search warrants in the detection of crime committed by their means, and, therefore, the absence of such warrants can scarcely be said to be "unreasonable;" (2) that since the operation of automobiles must be licensed by the state, the constitutional provision does not apply to them in the same manner and to the same degree as in the case of one's person, dwelling-house, place of business, or the like; (3) that a search and seizure is justified in order to suppress the commission of a continuing crime as contrasted with a search for evidence of a crime already committed; and (4) that such a search and seizure is different as to its reasonableness when it aims to secure the instrumentality of crime from when it seeks merely to obtain evidence of crime. Apart from this conclusion, however, as to the constitutionality of the search and seizure, we are of the opinion that the petitioners' case must fall because of the answer to be given to the final question involved in this discussion. Even assuming the invalidity of the search and seizure, is the evidence obtained by the officers as a result thereof nevertheless admissible at the trial of the defendants?

Upon this question there exist two diverse lines of opinion. The one view is that evidence obtained by an unconstitutional seizure is admissible the same as any other evidence secured by illegal means, and the only remedy of the injured person is a civil or criminal action against the offending officer or official. This view would not let an offender go free because a government official has done wrong, but would place the penalty for the violation of the Constitution upon the official and not upon society. The opposing view, on the other hand, makes the evidence inadmissible if obtained through an unreasonable search or seizure, not because of any logical reason for such a principle, but merely in order better, as it is assumed, to preserve inviolate the constitutional right.

As far as the authorities are concerned, it may be said, without fear of contradiction, that the weight of all the decisions in England, as well as in this country, was always to the effect that any evidence, if otherwise relevant, is admissible at the trial, irrespective of the means by which it was obtained, and that the court will not enter upon a collateral inquiry as to whether or not trickery, fraud, illegality or even criminality was resorted to in order to obtain the evidence thus offered. This doctrine had its origin two hundred years ago in the famous trial of Doctor Atterbury, 16 Howell's State Trials, 323, 495, 629, where the bishop's correspondence, surreptitiously obtained, was used as evidence against him in his impeachment. From that time on the doctrine was unopposed until, in 1885, in the case of Boyd v. United States, 116 U. S. 616, the Supreme Court of the United States took the opposite view, and, although in the succeeding case of Adams v. New York, 192 U. S. 585, there was a reversion to the thitherto prevailing doctrine, the Supreme Court in Weeks v. United States, 232 U. S. 383, again held that the evidence obtained in violation of the constitutional provision was inadmissible in the criminal prosecution, provided the matter was brought to the attention of the trial court within a reasonable time prior to the actual trial, and this doctrine was followed in Silverthorne Lumber Co. v. United States, 251 U. S. 385; Gouled v. United States, 255 U. S. 298; and Amos v. United States, 255

3 D. & C.

U. S. 313. The result of these decisions has been to weaken the unanimity with which the state courts had previously taken the opposite view, with the result that there are now a few states which, especially in connection with the National Prohibition Act, have adopted the Federal doctrine. By far the greater number of states, however, still hold to their original attitude upon this question, and in order to show the prevalence of this view and the extent to which it has imbedded itself into American jurisprudence, there are here cited leading cases from the state jurisdictions, not in any sense as a complete list of authorities, but merely as indicative of the extent to which the doctrine is upheld: Chastang v. State, 83 Ala. 29; Banks v. State, 93 So. Repr. (Ala.) 293; Scott v. State, 113 Ala. 64; Starchman v. State, 62 Ark. 538; Benson v. State, 149 Ark. 633; People v. Alden, 113 Cal. 264; People v. Le Doux, 155 Cal. 535; People v. Mayen, 205 Pac. Repr. (Cal.) 435; Ex parte Ajuria, 207 Pac. Repr. (Cal.) 515; State v. Pauley, 192 N. W. Repr. (N. Dak.) 91; State v. Griswold, 67 Conn. 290; State v. Chuchola, 120 Atl. Repr. (Del.) 212; Williams v. State, 100 Ga. 511; Calhoun v. State, 144 Ga. 679; Johnson v. State, 152 Ga. 271; Kennemer v. State, 154 Ga. 139; State v. Anderson, 31 Idaho, 514; State v. Myers, 211 Pac. Repr. (Idaho) 440; Stevison v. Earnest, 80 Ill. 513; Gindrat v. People, 138 Ill. 103; Trask v. State, 151 Ill. 523; People v. Paisley, 288 Ill. 310; State v. Tonn, 191 N. W. Repr. (Iowa) 530; State v. Miller, 63 Kan. 62; State v. Schmidt, 71 Kan. 862; State v. Turner, 82 Kan. 787; State v. Renaud, 50 La. Ann. 662; State v. Creel, 94 So. Repr. (La.) 433; State v. Bradley, 96 Me. 121; Lawrence v. State, 103 Md. 17; Com. v. Dana, 2 Metc. (Mass.) 329; Com. v. Tibbetts, 157 Mass. 519; Com. v. Acton, 165 Mass. 11; Com. v. Wilkins, 138 N. E. Repr. (Mass.) 11; People v. Case, 190 N. W. Repr. (Mich.) 289; State v. Hoyle, 98 Minn. 254; State v. Hesse, 191 N. W. Repr. ((Minn.) 267; State v. Pomeroy, 130 Mo. 489; State v. Reed, 53 Mont. 292; State v. District Court, 198 Pac. Repr. (Mont.) 362; Younger v. State, 80 Nebr. 201; Billings v. State, 191 N. W. Repr. (Nebr.) 721; State v. Flynn, 36 N. H. 64; People v. Adams, 176 N. Y. 351; People v. Esposito, 194 N. Y. Supp. 326; People v. Bowen, 198 N. Y. Supp. 306; Fusaro v. McKennell, 198 N. Y. Supp. 719; State v. Wallace, 162 N. C. 622; State v. Simmons, 183 N. C. 684; Houck v. State, 140 N. E. Repr. (Ohio) 112; Rosanski v. State, 140 N. E. Repr. (Ohio) 370; Knight v. State, 182 Pac. Repr. (Okla.) 736; State v. Harley, 107 S. C. 304; City of Sioux Falls v. Walser, 187 N. W. Repr. (S. Dak.) 821; Cohn v. State, 120 Tenn. 61; Rippey v. State, 219 S. W. Repr. (Tex.) 463; Welchek v. State, 247 S. W. Repr. (Tex.) 524; Barrett v. Fish, 72 Vt. 18; State v. Suiter, 78 Vt. 391; State v. Krinski, 78 Vt. 162; State v. Royce, 38 Wash. 111; State v. Edwards, 51 West. Va. 220.

The English doctrine is to the same effect: Legatt v. Tollervey, 14 East. 302; Stockfleth v. De Tastet, 4 Camp. 11; Queen v. Granatelli, 7 State Tr. (N. S.) 979, 987. So, also, Regina v. Doyle, 12 Ont. Rep. 347.

Perhaps the best statement of the rule is given in Com. v. Wilkins, 138 N. E. Repr. (Mass.) 11, where it is said: "It is a generally recognized principle of the law of evidence that courts do not pause in the trial of cases to investigate whether physical evidence, such as intoxicating liquors kept, carried or sold contrary to law, was obtained lawfully or unlawfully. That is regarded as a collateral inquiry. The only matter considered by the court is whether such evidence is pertinent to the issue. Courts do not impose an indirect penalty upon competent evidence because of illegality in obtaining it. An ordinary police officer is not regarded as the agent of government if he acts

outside the scope of his authority in seizing tangible evidence of crime. He does not carry with him the support of the Government, but incurs personal liability if he fails to keep within the bounds of his duty. Outside those bounds he has no more color of authority than a private individual. Whether he commits a crime or a civil wrong, the offending officer alone is responsible. .... For the misconduct of a private individual, the Government is not answerable. He may be brought to court to answer for his wrong either civilly or criminally. But his misconduct ought not to hamper the Government in the enforcement of laws and the preservation of order. The wrong committed in seizing the liquor without a warrant was a transaction by itself. It has no necessary connection with its subsequent use as evidence."

And in People *v.* Mayen, 205 Pac. Repr. (Cal.) 435, it is said: "The Constitution and the laws of the land are not solicitous to aid persons charged with crime in their efforts to conceal or sequester evidence of their iniquity. From the necessities of the case the law countenances many devious methods of procuring evidence in criminal cases. The whole system of espionage rests largely upon deceiving and trapping the wrongdoer into some involuntary disclosure of his crime. It dissimulates a way into his confidence; it listens at the keyhole and peers through the transomlight. It is not nice, but it is necessary in ferreting out the crimes against society which are always done in darkness and concealment. Thus it is that almost from time immemorial courts engaged in the trial of a criminal prosecution have accepted competent and relevant evidence without question, and have refused to collaterally investigate the source or manner of its procurement, leaving the parties aggrieved to whatever direct remedies the law provides to punish the trespasser or recover the possession of goods wrongfully taken."

So well established is the doctrine that Greenleaf says in his work on Evidence (vol. 1, § 254 *a*) : "It may be mentioned in this place that, though papers and other subjects of evidence may have been illegally taken from the possession of the party against whom they are offered or otherwise unlawfully obtained, this is no valid objection to their admissibility if they are pertinent to the issue. The court will not take notice how they were obtained, whether lawfully or unlawfully, nor will it form an issue to determine that question. This principle is regularly applied to incriminating materials—tools, liquor, documents, etc.—obtained by unlawful search of premises, or by unlawful search of the person, or by other unauthorized means."

See, also, 4 Wigmore on Evidence, § 2183; A. W. Blakemore on National Prohibition, p. 356, etc., a volume just issued; and also the masterly article of Prof. Wigmore in the American Bar Association Journal for August, 1922, page 479, where the author, criticizing the doctrine adopted by the Federal courts, says quaintly but cogently: "The natural way to do justice here would be to enforce the splendid and healthy principle of the 4th Amendment directly, *i. e.*, by sending for the high-handed, over-zealous marshal who had searched without a warrant, imposing a thirty-day imprisonment for his contempt of the Constitution, and then proceeding to affirm the sentence of the convicted criminal. But the proposed indirect and unnatural method is as follows: 'Titus, you have been found guilty of conducting a lottery; Flavius, you have confessedly violated the Constitution. Titus ought to suffer imprisonment for crime, and Flavius for contempt. But no! We shall let you both go free. We shall not punish Flavius directly, but shall do so by reversing Titus's conviction. This is our way of teaching people like Flavius to behave, and of teaching people like Titus to behave, and incidentally of secur-

3 D. & C.

ing respect for the Constitution. Our way of upholding the Constitution is not to strike at the man who breaks it, but to let off somebody else who broke something else!' Some day, no doubt, we shall emerge from this quaint method of enforcing the law."

It seems difficult successfully to answer the logic of this statement. Moreover, it is obviously true that the object of evidence is to elicit truth, and it can never be said that the principal value of any evidentiary fact is affected in the smallest particle by the manner or the means whereby the fact itself was obtained. The principle involved is analogous to the doctrine that, notwithstanding the extradition laws and the constitutional provision in regard thereto, if a person accused of crime, who has fled the jurisdiction, be seized and kidnapped in the state of his flight, and, in utter disregard of the legal machinery of extradition, he is forcibly brought back to the state where the crime was committed, he will be tried in the latter state, and the courts of that state will not entertain any question as to the manner in which he was thus brought into their jurisdiction, but will leave it to the prisoner to redress his wrongs in another proceeding. This rule has been thoroughly established, both in the Federal and state as well as in the English courts: Mahon v. Justice, 127 U. S. 700; Lascelles v. Georgia, 148 U. S. 537; In re Johnson, 167 U. S. 120; Adams v. New York, 192 U. S. 585; Pettibone v. Nichols, 203 U. S. 192; Ex parte Scott, 9 B. & C. 446; Regina v. Lopez and Sattler, 1 Dearsley and Bell's Crown Cases, 525; State v. Brewster, 7 Vt. 118; Ex parte Barker, 87 Ala. 4; People v. Pratt, 78 Cal. 345; State v. Smith, 1 Bailey's Law Reps. (S. C.) 283; State v. Ross and Mann, 21 Iowa, 467; Dows' Case, 18 Pa. 37; Com. v. Kenney, 80 Pa. Superior Ct. 418.

The matter is also somewhat analogous to the case of the confession obtained from a prisoner through a trick, and it has always been held that such fact is no objection to its competency, unless indeed the circumstances be such as to suggest an inference that a false confession was made through fear or hope. On this point it is stated in Com. v. Cressinger, 193 Pa. 326: "The object of evidence is to get at the truth, and a trick which has no tendency to produce a confession, except one in accordance with the truth, is always admissible. Society and the criminal are at war, and capture by surprise, or ambush, or masked battery is as permissible in one case as in the other." This is quoted with approval in Com. v. Spardute, 278 Pa. 37.

We come, finally, to a consideration of the Pennsylvania cases in regard to the general doctrine of the admissibility of evidence obtained as a result of an unlawful search and seizure or by reason of some other illegality, and we find that they are in complete harmony with the doctrine generally prevailing in the states of the Union, as above set forth. Thus, in Com. v. Exler, 61 Pa. Superior Ct. 423, the return to the defendant of certain clothing which had been obtained from the defendant's home without a search warrant was refused, and the district attorney was allowed to use these articles as evidence.

In Com. v. Holgate, 63 Pa. Superior Ct. 246, where a constable went to a farm without a search warrant and there found a stolen buggy, the court said, per Mr. Justice Trexler: "What occurred was evidence, irrespective of the legality of the search warrant, and the collateral issue as to the right of the constable to enter the premises threw no light on the question trying. The instruction of the court that the jury might consider that the constable proceeded properly was merely excluding from their consideration something that should not enter into the decision of the case. Had any one without a warrant come to defendant's premises in search of the stolen property, the

latter's acts and declarations would have been proper evidence if offered by the Commonwealth."

In Com. v. Vigliotti, 75 Pa. Superior Ct. 366, where evidence was admitted of liquor which it was claimed had been seized in violation of the constitutional provision against unreasonable searches and seizures, the court said, per Mr. Justice Henderson: "Conceding that the packages were taken from the store and residence of the defendants without authority, the admissibility of the evidence is not affected by the illegality of the means through which it was obtained. The court will not suspend the conduct of a trial to enter into a collateral inquiry as to the means through which the evidence, otherwise competent, was obtained. If a wrong was done the owner, his remedy is in a different forum."

In Com. v. Grasse, 80 Pa. Superior Ct. 480, the above quotation was approved and the same doctrine maintained, this time in connection with the admission in evidence of drugs alleged to have been taken from the defendant's house without a warrant and in violation of the constitutional provision against unreasonable searches and seizures.

And, finally, in Com. v. Klein and Goodstein, 81 Pa. Superior Ct. 551, whiskey seized from the defendant's automobile without a search warrant was admitted in evidence, and such admission approved and sustained by the Superior Court.

Finding, therefore, that the Pennsylvania authorities are thus in accord with the prevailing doctrine adverted to, we summarize our conclusions as follows:

1. Both the State legislation and the common law furnish authority to police officers to stop, and, with or without a warrant, to search motor-vehicles for contraband or other instrumentalities of crime—a power, however, which, of course, should never be abused by an over-zealous police administration.

2. The authority thus referred to is valid and lawful, and does not contravene the constitutional rights of citizens against unreasonable searches and seizures.

3. Even, however, if such search and seizure be unconstitutional, and, therefore, invalid, the physical evidence secured thereby as well as the testimony of the officers in regard to its discovery are competent evidence upon the trial of the criminal cause, and will not be excluded because of any alleged illegality in the method by which such evidence and testimony were obtained.

The result is that we conclude that the defendants' petitions should be, and they are, dismissed.